USAA FEDERAL SAVINGS
BANK, Appellant

v.

Ann D. McLAUGHLIN, Secretary
of Labor, et al.

No. 87–5062.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 9, 1988.

Decided June 24, 1988.

Kalvin M. Grove, with whom Jeffrey S. Goldman, Chicago, Ill., and Robert F. McDermott, Jr. were on the brief, for appellant. Andrew M. Kramer, Washington, D.C., also entered an appearance for appellant.

Lisa J. Stark, Attorney, Dept. of Justice, for appellees. James D. Henry, Associate Sol., Dept. of Labor, William Bradford Reynolds, Asst. Atty. Gen., and Debra A. Millenson, Attorney, Dept. of Labor, Washington, D.C., were on the brief for appellees.

Before STARR, SILBERMAN and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

This appeal raises questions concerning the finality of agency action. USAA Federal Savings Bank, a federally chartered and insured savings bank, brought suit in federal district court seeking declaratory and injunctive relief against the Secretary of Labor, the Director of the Office of Federal Contract Compliance Programs (OFCCP), and an Area Office Director of OFCCP. The gravaman of the complaint was that OFCCP had improperly sought to assert jurisdiction over the Bank as a federal contractor solely by virtue of the Bank's status as a subscriber to the deposit insurance program administered by the Federal Savings and Loan Insurance Corporation. The District Court dismissed the action, finding that the Bank had failed to exhaust administrative remedies. This appeal followed. For the reasons that follow, we affirm.

I

The pertinent facts can be briefly stated. In December 1985, an OFCCP area office notified the Bank that it had been selected for an equal opportunity compliance review pursuant to Executive Order 11246, which prohibits discriminatory employment practices by federal contractors. *See* Exec. Order No. 11,246, 3 C.F.R. 258 (1964–1965), *reprinted in* 42 U.S.C. § 2000e App. at 28 (1982). In a series of communications to OFCCP, the Bank asserted that it was not in fact a federal contractor so as to fall within the ambit of the Executive Order and OFCCP's concomitant jurisdiction. The exchange of correspondence eventuated in a letter from OFCCP's Director setting forth OFCCP's view that the Bank's contract for deposit insurance with the FSLIC sufficed to bring it within the Executive Order's reach. With the agency demanding that the Bank accede to the compliance review request, the Bank repaired to federal district court. The Bank sought a judgment declaring that the institution is not a government contractor and that, consequently, the Secretary of Labor and OFCCP are without authority to require compliance with the Executive Order's strictures.

The complaint was destined to be short-lived. The defendants promptly filed a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) for failure to exhaust administrative remedies. Following oral argument, the District Court granted the motion without opinion.

II

Resolution of this appeal turns on whether the Bank's pre-enforcement suit is premature. The precise conceptual box into which prematurity concerns are most appropriately fitted has evolved into a lively issue in administrative law, with the Government in this case now featuring ripeness as its principal objection to judicial intervention at this juncture. The alert reader will have readily discerned that this

represents a conceptual shift from the position championed in the trial court, where the Government relied exclusively on exhaustion. Stirring the prematurity pot further, the Government emphasizes that the Bank is but part of a larger corporate family and that contractual ties between the Bank's parent and the federal leviathan may well exist, thereby providing the requisite jurisdictional predicate for coverage under the Executive Order. The unknowns of the USAA-federal relationship, the Government contends, further counsel in favor of judicial forebearance.

The Bank maintains that for almost 20 years OFCCP has relied on the existence of deposit insurance to assert jurisdiction over federally insured financial institutions. Latter-day expressions of government interest in the possible existence of other federal contracts within the USAA corporate family are, the Bank assures us, merely a litigation-inspired diversion, as evidenced by OFCCP's hitherto firm position that FSLIC insurance, standing alone, sufficed to trigger the Bank's federal contractor status. The consistency of OFCCP's position, the Bank suggests, renders fruitless recourse to the agency's compliance enforcement proceedings, which have been stayed pending disposition of this appeal. *See OFCCP v. USAA Fed. Sav. Bank*, No. 87–OFC–27 (Dec. 4, 1987) (order staying administrative action).

The Government does not, and indeed in reason cannot, deny that OFCCP's position on the coverage issue is consistent and of long standing. But appellees quickly add that OFCCP does not have the final word on the issue. Only the Secretary of Labor enjoys authority ultimately to speak for the Department on that question and, as the Government sees it, the Secretary has yet to speak.

The Bank contests the Secretary's alleged silence on this issue. Pointing to a responsive letter in 1986 from then-Secretary Brock to the president of the National Council of Savings Institutions, who had written to the Secretary to bring the coverage issue to his attention, the Bank maintains that "[t]he Secretary's support [of OFCCP's position] was unconditional and firm." Appellant's Brief at 17. In that letter, Secretary Brock set forth in brief compass the history of OFCCP's position vis-a-vis coverage of federally insured financial institutions. He stated as follows:

To the extent that OFCCP has identified financial institutions for investigation based on share or deposit insurance, such action is being taken pursuant to a long-standing policy of OFCCP that Federal deposit and share insurance constitutes contracts under Executive Order 11246; and, at least since 1972, OFCCP has maintained jurisdiction over savings and loan associations based on these kinds of contractual relationships.

Letter from William E. Brock, Secretary of Labor, to John H. Rousselot, President, National Council of Savings Institutions (June 27, 1986), Joint Appendix (J.A.) at 61A, *quoted in* Appellant's Brief at 17 (hereinafter Rousselot Letter). This, the Bank asserts, constitutes clear Cabinet-level approbation of OFCCP's position. Accordingly, to relegate it to the demands of an agency enforcement action is, in the Bank's view, to condemn it to an injurious exercise in futility. Relegating the Bank to such an unhappy fate would also be incompatible, the argument goes, with precedents granting pre-enforcement review of agency action. The Bank encapsulates this view in the following passage from its opening brief:

Pre-judgment review has been granted, as here, where the record demonstrated that the agency 'contemplated full and prompt compliance,' or the policy had been 'considered and reconsidered' by the agency, or where 'the claim of the businessman had been considered and rejected by the government officials who had primary responsibility for the application and implementation of the statute.' In the instant case, all three of the foregoing factors are present.

Appellant's Brief at 27 (citations and brackets omitted). Under the circumstances of this case, the Bank concludes, the agency's actions easily meet the finality standards articulated by the Supreme Court in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87

S.Ct. 1507, 18 L.Ed.2d 681 (1967), and which were at issue in such recent decisions of this court as *Ciba–Geigy Corp. v. EPA,* 801 F.2d 430 (D.C.Cir.1986).

### III

■ We find it unnecessary to plumb the depths of the closely related analytical doctrines that share the dual concerns of prematurity of judicial intervention in agency processes and the proper and principled exercise of judicial power. As the three separate opinions in *Ticor Title Ins. Co. v. FTC,* 814 F.2d 731 (D.C.Cir.1987), eloquently attest, prematurity concerns may find their way into one of three conceptual boxes: ripeness, finality, and exhaustion of administrative remedies. We need not undertake this challenging doctrinal exercise, because in our view this case is controlled by the Supreme Court's decision in *FTC v. Standard Oil Co.,* 449 U.S. 232, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980) ("*SOCAL* "). *SOCAL* is no stranger to the world of administrative law and the lawyers who ply this trade, and we therefore need only remind the reader of its basic holding: the mere issuance of an administrative complaint does not constitute final agency action. While adhering to the teaching of *Abbott Laboratories* that " 'the cases dealing with judicial review of administrative actions have interpreted the "finality" element in a pragmatic way,' " *id.* at 239, 101 S.Ct. at 493 (quoting *Abbott Laboratories,* 387 U.S. at 149, 87 S.Ct. at 1516) (brackets omitted), the *SOCAL* Court nonetheless concluded that the issuance of a complaint did not represent the "definitive statement" of the Trade Commission's position. *Id.* 449 U.S. at 241, 101 S.Ct. at 493. To the contrary, the Court found that the FTC's action represented only "a threshold determination that further inquiry is warranted." *Id.* at 241–42, 101 S.Ct. at 493–94.

■ In this case, we are satisfied that the agency's position on the coverage issue does not rise to the *SOCAL*-demanded level of a "definitive statement." In our view, the Secretary of Labor has, as yet, failed to speak specifically to the question with the formality and finality required of a "definitive statement" of position. For starters, the Government has specifically represented to us both in its brief and at oral argument that the Secretary has not in fact opined definitively on the coverage issue. Appellees emphasize that the pivotal question (whether FSLIC insurance renders a private financial institution a government contractor) has long been a source of debate and disagreement within the Executive Branch. Appellee's Brief at 19–20. The liveliness of the debate is evidenced by the history of a 1979 proposed regulation which would have made insurance coverage sufficient to trigger applicability of the Executive Order and the elaborate OFCCP machinery. *See* 44 Fed.Reg. 77,014 (1979). The proposed regulation, the Government emphasizes, made it only into the pages of the Federal Register, not into the Code of Federal Regulations, as it was never finally promulgated and allowed to go into effect. The issue, we are assured, continued to fester unresolved.

But then there is Secretary Brock's letter. In addressing this missive, the Government emphasizes, rightly we think, that the letter represented an informal communication which did not purport to state the Secretary's position with respect to the coverage question. Instead, fairly read, the letter set forth only the undeniable fact of OFCCP's long-held position. At the same time, we readily acknowledge that Secretary Brock's letter was not crafted with assiduous care; it does not, as the Government would have it, expressly "preserve[ ] [the Secretary's] independence to make a judgment regarding OFCCP's policy." Appellees' Brief at 18. The letter refers not only to OFCCP, but also, more loosely, to the *Department of Labor's* stand on the coverage issue. Rousselot Letter, J.A. at 62A. This reference obviously bolsters the Bank's position. If the Secretary were indeed striving with lawyerlike care to preserve his "independence" on this hot potato of an issue, he surely would have eschewed reference to any institutional words, such as the Department of Labor, as opposed to a Departmental component (and an enforcement arm at that), such as OFCCP.

But, upon reflection, the informality of the communication (an unpublished letter to a particular individual responding to a specific inquiry) * coupled with the history, adumbrated above, of the OFCCP position, which has yet to garner formal approbation from the senior levels of the Department of Labor, leads us to conclude that no "definitive statement" of the Department's position has been forthcoming. In so concluding, we have borne in mind the Government's express representation to this court: "[T]he issue is plainly controversial and [remains] unresolved within the Executive Branch." Appellees' Brief at 20.

The preliminary, non-final nature of the agency action is what takes this case out of the *Abbott Laboratories* line of authorities and leaves it within the *SOCAL* line. In *Abbott Labs* and similar cases, pre-enforcement review of agency action was allowed where the party seeking judicial intervention pointed to a specific, concrete effect on the party's primary conduct occasioned by the agency's action—an effect going beyond forced participation in the enforcement proceeding itself. In the face of the regulations at issue in *Abbott Labs*, for example, pharmaceutical firms were forced either to change all labels and promotional materials for various generic drugs or refuse to abide by the new regulations and risk serious criminal and civil penalties for

noncompliance. *Abbott Labs*, 387 U.S. at 152–53, 87 S.Ct. at 1517–18. In contrast to this direct and substantial burden, Socal was required to make no alteration in the day-to-day conduct of its business; rather, the company could point only to the unpleasantness and burden of defending itself in an administrative proceeding that the oil company earnestly believed was utterly ill-founded (specifically, Socal's charge was that the FTC's complaint against the integrated oil companies was an ill-conceived, unsupported attack inspired by politics rather than facts.) *SOCAL*, 449 U.S. at 235, 242, 101 S.Ct. at 490, 494. The Supreme Court was not unmindful of the burden on Socal in leaving it to the tender mercies of the Trade Commission's administrative apparatus; that burden, however, was simply not enough. Contrasting Socal's circumstances to those of Abbott Labs and similarly situated firms affected by the generic-drug regulations, the Court stated as follows:

> Socal does not contend that the issuance of the complaint had any such legal or practical effect, except to impose upon Socal the burden of responding to the charges made against it. Although this burden certainly is substantial, it is different in kind and legal effect from the burdens attending what heretofore has

---

* The formality of an agency communication bears on whether the action is final within the meaning of *SOCAL*. Informality may well be an indicator of non-finality. At the same time, the cases make it clear that formality of agency action does not end the inquiry; we are not, in effect, to substitute labels for analysis. The question of finality *vel non*, like statutory interpretation, is a holistic inquiry requiring thought, not labels. Cf. *United Sav. Ass'n v. Timbers of Inwood Forest Assoc.*, —— U.S. ——, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) (Scalia, J.). In one of this circuit's frequently cited cases, for example, a letter from the Administrator of the Wage and Hour Division of the Department of Labor (as opposed to the Secretary) was deemed to fit within the ambit of final agency action. *National Automatic Laundry and Cleaning Council v. Shultz*, 443 F.2d 689 (D.C.Cir.1971). The court found that the letter was "intended as a deliberative determination of the agency's position at the highest available level." *Id.* at 701. Although not the product of a formal agency process, the court observed that "informality in the communication does not negative the substance

of what has been done and the reality that it is the 'final' such action of the agency." *Id.* at 702. Discerning finality in relatively informal agency action is therefore nothing new.

The Government, it bears noting, does not question this holistic mode of analysis. Nor does the Government seek to elevate formality to the core inquiry in finality analysis. More modestly, the Government, rightly we believe, points non-dispositively to the informal nature of the communication from Secretary Brock, which merely reiterated OFCCP's position on the issue without providing any rationale or analysis. The Government also emphasizes OFCCP's unrequited quest to carve its position on coverage into formal regulatory stone as a final agency regulation. Under these circumstances, it would be rather odd for the Secretary to accomplish informally by means of a modest page-and-a-half, informal letter what his predecessor had failed to accomplish due to the strong winds of opposition blowing from other quarters of the Executive Branch (at least in the absence of a sea change in weather conditions).

been considered to be final agency action.

*Id.* at 242, 101 S.Ct. at 494.

And in that pivotal passage lies the rub for the Bank in this case. At bottom, the Bank has been called upon, much to its chagrin, to participate in a proceeding that lies beyond what the Bank believes to be OFCCP's lawful powers. But although the infirmity allegedly infecting OFCCP's action is obviously different than that asserted in *SOCAL*, the governing principle is the same. Where, as here, the "injury" inflicted on the party seeking review is the burden of going through an agency proceeding, *SOCAL* teaches that the party must patiently await the denouement of proceedings within the Article II branch.

This distinguishing characteristic also renders unavailing this court's decision two Terms ago in *Ciba–Geigy*, which is featured by the Bank in its Reply Brief. The issue there was quite distinct from that raised by the Bank in this case. In brief, EPA had directed a regulated entity to change immediately its labels on certain pesticide products or risk civil and criminal proceedings. *Ciby–Geigy*, 801 F.2d at 432–33. This set of circumstances, the *Ciba–Geigy* court found, fit within the rationale articulated by Justice Harlan, speaking for the Court in *Abbott Labs*. EPA had publicly stated its position that regulated entities were not entitled to a hearing before the agency could require labelling changes, thereby depriving Ciba–Geigy of what it claimed to be a statutorily assured cancellation hearing. *Id.* at 436–37. In addition, the agency's communications with the company gave no indication that its position was subject to further agency consideration or possible modification. *Id.* at 437. Finally, Ciba–Geigy was able to demonstrate a here-and-now effect on its primary conduct, including loss of sales on some products due to its compliance with EPA's new labelling requirement and its cessation of sales of several other pesticides that would have necessitated relabelling.

The situation presented by the Bank stands in stark contrast to that of Ciba–Geigy. The agency here is not only willing to grant the Bank a hearing at which, the Government assures us, its arguments can be raised, but it has already set the hearing process in motion. *See supra* p. 1506. At the conclusion of this proceeding, the Bank, if dissatisfied, may follow the Department's established procedures and request review of OFCCP's disposition by the Secretary.

The Bank's claims of irreparable injury similarly fall short. Although the Bank argues that OFCCP's request for a compliance review has "subjected the Bank to a Hobsonian [sic] dilemma," Appellant's Brief at 22, we can find no such hard choice in these facts. The Bank need not comply with the affirmative-action requirements of Executive Order 11246 until the coverage issue is resolved in the now-stalled administrative proceeding. Failure to comply prior to this resolution will subject the Bank to no new potential sanctions. At bottom, the Bank objects to the burden of the proceeding itself, a concern interdicted squarely by *SOCAL*.

Under these circumstances, we are persuaded that *SOCAL* requires us to allow the agency enforcement proceeding to proceed without judicial interruption. The Bank must rest content with the assurance, provided by the Government both orally and in writing, that the Secretary of Labor has yet to come to rest on the coverage issue and that the question therefore remains fully open to resolution in the administrative arena. At this juncture, judicial review "is likely to ... interfere[] with the proper functioning of the agency and [be] a burden for the court[]." *SOCAL*, 449 U.S. at 242, 101 S.Ct. at 494. That being so, *SOCAL* requires the judiciary to stay its hand.

For the foregoing reasons, the judgment of the District Court in dismissing the action is

*Affirmed.*