# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued April 13, 2015                Decided September 29, 2015

No. 14-5196

GEORGE R. JARKESY, JR. AND PATRIOT28, LLC,
APPELLANTS

v.

SECURITIES AND EXCHANGE COMMISSION,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:14-cv-00114)

———

*S. Michael McColloch* argued the cause for appellants.
With him on the briefs were *Karen L. Cook* and *Mark B.
Bierbower*.

*Dominick V. Freda*, Senior Litigation Counsel, Securities
and Exchange Commission, argued the cause for appellee.
With him on the brief were *Richard M. Humes*, Associate
General Counsel, *Samuel M. Forstein*, Assistant General
Counsel, and *Sarah E. Hancur*, Senior Counsel.

Before: KAVANAUGH and SRINIVASAN, *Circuit Judges*,
and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* SRINIVASAN.

SRINIVASAN, *Circuit Judge*: The Securities and Exchange Commission brought an administrative proceeding against George Jarkesy, Jr., charging him with securities fraud. That proceeding remains ongoing. In the meantime, Jarkesy filed this action in federal district court seeking the administrative proceeding's termination. He argues that the proceeding's initiation and conduct infringe his constitutional rights in several ways. The district court dismissed his action for lack of subject-matter jurisdiction. The court concluded that Congress, by establishing a detailed statutory scheme providing for an administrative proceeding before the Commission plus the prospect of judicial review in a court of appeals, implicitly precluded concurrent district-court jurisdiction over challenges like Jarkesy's.

We agree with the district court and affirm its judgment. In *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), the Supreme Court set forth a framework for determining when a statutory scheme of administrative and judicial review forecloses parallel district-court jurisdiction. The ultimate question is whether Congress intended exclusivity when it established the statutory scheme. Applying the considerations outlined in *Thunder Basin* and its progeny, we find the answer here is yes. The result is that Jarkesy, instead of obtaining judicial review of his challenges to the Commission's administrative proceeding now, can secure judicial review in a court of appeals when (and if) the proceeding culminates in a resolution against him.

3

I.

A.

The SEC generally has two routes by which to enforce the federal securities laws in a civil proceeding. The agency can bring a civil action against the alleged violator in federal district court, or it can initiate an administrative enforcement proceeding. *See, e.g.*, 15 U.S.C. §§ 78u(d), 78u-2, 78u-3. At one time, the remedies the SEC could seek against respondents in administrative proceedings were relatively limited. In 2010, however, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act, which expanded the remedies available to the SEC in administrative proceedings. *See* Pub. L. No. 111-203, § 929P, 124 Stat. 1376, 1862-65. The practical effect, generally speaking, was to "mak[e] the SEC's authority in administrative penalty proceedings coextensive with its authority to seek penalties in Federal court." H.R. Rep. No. 111-687, at 78 (2010). Nothing in Dodd-Frank or the securities laws explicitly constrains the SEC's discretion in choosing between a court action and an administrative proceeding when both are available. *See* J.A. 236.

The SEC's Enforcement Division prosecutes violations in both forums. In administrative proceedings, the SEC's Rules of Practice govern. 17 C.F.R. §§ 201.100 *et seq.* The Commission presides over a proceeding, or, if the Commission so decides, an administrative law judge hears the case initially. *Id.* § 201.110. If the latter, the ALJ holds a hearing and then renders an initial decision, which the respondent may appeal by filing a petition for review with the full Commission. *Id.* §§ 201.360(a)(1), 201.410(a). The Commission reviews ALJ decisions de novo, and it alone

possesses the authority to issue a final order. *Id.* §§ 201.411(a), 201.360(d)(2).

Under the securities laws, final Commission orders can be reviewed in the courts of appeals. The Securities Exchange Act, for instance, provides that "[a] person aggrieved by a final order of the Commission entered pursuant to this chapter may obtain review of the order in the United States Court of Appeals for the circuit in which he resides or has his principal place of business, or for the District of Columbia Circuit, by filing in such court . . . a written petition requesting that the order be modified or set aside in whole or in part." 15 U.S.C. § 78y(a)(1). The Securities Act, the Investment Advisers Act, and the Investment Company Act all contain similarly worded provisions. *See id.* § 77i(a) (Securities Act); *id.* § 80b-13(a) (Advisers Act); *id.* § 80a-42(a) (Company Act).

B.

Patriot28, LLC (formerly known as John Thomas Capital Management) is an unregistered investment adviser and general partner of two hedge funds. George Jarkesy, Jr., is the manager of Patriot28. On March 22, 2013, the SEC issued an Order Instituting Administrative and Cease-and-Desist Proceedings against Jarkesy and Patriot28 along with two other respondents. The SEC alleged that they engaged in fraudulent conduct in connection with the offer, purchase, and sale of securities, and charged them with violations of the Exchange Act, the Securities Act, the Advisers Act, and the Company Act. Jarkesy's and Patriot28's two co-respondents—John Thomas Financial, Inc. (a broker-dealer) and Anastasios Belesis (the founder and CEO of John Thomas Financial)—were alleged to have aided and abetted Jarkesy's violations of the securities laws. The SEC sought

disgorgement of fees, civil penalties, a cease-and-desist order, and securities-industry and officer-and-director bars against Jarkesy.

The matter was set for a hearing to take place before an ALJ. In the fall of 2013, John Thomas Financial and Belesis settled with the Commission, and on December 5, 2013, the Commission issued an order approving the settlement. That order included factual and legal findings concerning John Thomas Financial's and Belesis's misconduct. Those findings, in turn, discussed the fraudulent conduct of the "Manager" and the "Adviser" of the hedge funds—references to Jarkesy and Patriot28. The Commission's order noted, however, that its findings had been "made pursuant to Respondents' Offer of Settlement and are not binding on any other person or entity in this or any other proceeding." John Thomas Capital Mgmt. Grp., Exchange Act Release No. 70,989, 2013 WL 6327500, at *1 n.1 (Dec. 5, 2013).

In response, Jarkesy and Patriot28 took two actions. First, in a petition for interlocutory review filed with the Commission, they sought to disqualify the Commissioners and obtain a dismissal of the administrative proceeding on the ground that the Commission had "conclusively prejudiced the case" against them. John Thomas Capital Mgmt. Grp., Securities Act Release No. 9519, 2014 WL 294551, at *1 (Jan. 28, 2014). Second, on January 29, 2014, days before the hearing before the ALJ was set to begin on February 3, they filed an action in the United States District Court for the District of Columbia. The action seeks injunctive and declaratory relief "to prevent the SEC from proceeding with an administrative proceeding" that, in their view, "has violated, and will continue to violate, [their] fundamental constitutional rights." Compl. ¶ 1 (J.A. 8).

Jarkesy and Patriot28's district-court complaint included several claims. Because the nature of those arguments bears on the jurisdictional analysis in some measure, we relay the complaint's contents with precision.

*First*, Jarkesy and Patriot28 alleged a Fifth Amendment Due Process Clause violation based on the Commission's supposed prejudgment of their charges, arguing that the administrative proceeding should be nullified as a result. Compl. ¶¶ 17-24 (J.A. 13-14). *Second*, they alleged that the Commission's decision to place them in an administrative proceeding violated their rights under the Equal Protection Clause by denying them the "fundamental right to [a] jury trial." *Id.* ¶¶ 25-30 (J.A. 14-15). Explaining that the SEC "chooses whether to bring cases in [administrative proceedings] or in federal court on a case-by-case basis, subject to no standard," they alleged that "parties charged by the SEC have their fundamental Seventh Amendment right to jury trial preserved, or denied, based on the arbitrary, capricious or malicious decision of the Commission." *Id.* ¶¶ 25, 27 (J.A. 14-15). *Third*, they alleged another equal protection argument under a "class-of-one" theory, asserting that, while the Commission had taken similarly situated individuals to court, the Commission's decision to charge Jarkesy and Patriot28 in an agency proceeding was motivated by animus. *Id.* ¶¶ 31-38 (J.A. 16-17). *Fourth*, they alleged improper ex parte communications between the SEC Enforcement Division and the Commissioners regarding their co-respondents' settlement, in violation of the Administrative Procedure Act. *Id.* ¶¶ 39-46 (J.A. 17-19). *Fifth* and finally, they alleged another due process violation based on the Commission's ostensible failure to comply with its *Brady* obligations under the SEC's Rules of Practice. *Id.* ¶¶ 47-59 (J.A. 19-22).

The district court denied the plaintiffs' request for a temporary restraining order that would have barred the SEC from proceeding with the scheduled hearing. *Jarkesy v. SEC*, 48 F. Supp. 3d 32, 34, 36 (D.D.C. 2014). The court subsequently dismissed the complaint, finding that the "statutory and regulatory regime under which the SEC's Enforcement Division brought the instant matter against the plaintiffs preclude[d]" the court from hearing their claims. *Id.* at 37. "Although the plaintiffs raise various allegations of violations of their constitutional rights," the court explained, "those claims are inextricably intertwined with the conduct of the very enforcement proceeding the statute grants the SEC the power to institute and resolve as an initial matter." *Id.* at 38. The court thus found that Jarkesy and Patriot28 had to wait to raise their arguments about the proceeding's deficiencies "before a Court of Appeals should the ALJ and the Commission issue orders adverse to them." *Id.*

Meanwhile, the SEC's administrative proceeding moved forward. The ALJ conducted hearings in February and March of 2014 and issued her initial decision in October. In addition to finding that Jarkesy and Patriot28 had violated the securities laws, the ALJ rejected their prejudgment, equal protection, ex parte communications, and *Brady* arguments. *See* John Thomas Capital Mgmt. Grp., Initial Decision Release No. 693, 2014 WL 5304908, at \*1-6 (ALJ Oct. 17, 2014). Jarkesy and Patriot28 filed a petition for review of the ALJ's decision with the Commission. They also filed a motion asking the Commission to stay further proceedings pending a decision from our court in their appeal of the district court's dismissal.

On February 20, 2015, the Commission issued an order denying the stay. As of the date of this opinion, the Commission has yet to rule on the petition.

8

II.

We review de novo the district court's determination that it lacked authority over Jarkesy and Patriot28's claims (who, for ease of reference, we will refer to collectively as Jarkesy from this point forward). *See Fisher-Cal Indus., Inc. v. United States*, 747 F.3d 899, 902 (D.C. Cir. 2014). We agree with the district court.

Federal courts possess only the power authorized by the Constitution and by statute. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "Within constitutional bounds, Congress decides what cases the federal courts have jurisdiction to consider." *Bowles v. Russell*, 551 U.S. 205, 212 (2007). Litigants generally may seek review of agency action in district court under any applicable jurisdictional grant.

If a special statutory review scheme exists, however, "it is ordinarily supposed that Congress intended that procedure to be the exclusive means of obtaining judicial review in those cases to which it applies." *City of Rochester v. Bond*, 603 F.2d 927, 931 (D.C. Cir. 1979). The question in this appeal is whether the district court has jurisdiction over all, or any, of Jarkesy's claims, or whether Congress has implicitly precluded Jarkesy's district-court suit by channeling his challenges through the securities laws' scheme of administrative adjudication and judicial review in a court of appeals. The decision we review is one of a growing number of decisions to address the same question, including a recent decision by the Seventh Circuit. *See Bebo v. SEC*, No. 15-1511, 2015 WL 4998489 (7th Cir. Aug. 24, 2015). The Seventh Circuit found no district-court jurisdiction, *id.* at *10,

and we reach the same conclusion for many of the same reasons.[*]

Our analysis proceeds in accordance with the two-part approach set forth in *Thunder Basin Coal Co. v. Reich*. 510 U.S. 200 (1994). Under *Thunder Basin*'s framework, courts determine that Congress intended that a litigant proceed exclusively through a statutory scheme of administrative and judicial review when (i) such intent is "fairly discernible in the statutory scheme," and (ii) the litigant's claims are "of the type Congress intended to be reviewed within [the] statutory structure." *Id.* at 207, 212; *see Elgin v. Dep't of Treasury*, 132 S. Ct. 2126, 2132-33 (2012); *Free Enterprise Fund v.*

---

[*] Various district courts have reached divergent conclusions. *See Tilton v. SEC*, No. 15-CV-2472, 2015 WL 4006165, at *1 (S.D.N.Y. June 30, 2015) (no jurisdiction over Appointments Clause and removal power claims); *Spring Hill Capital Partners, LLC v. SEC*, No. 15-CV-4542 (S.D.N.Y. June 26, 2015) (bench ruling) (no jurisdiction over Appointments Clause claim) (transcript attached to Appellee 28j Letter (filed July 8, 2015)); *Hill v. SEC*, No. 1:15-CV-1801, 2015 WL 4307088, at *4, 9 (N.D. Ga. June 8, 2015) (jurisdiction over non-delegation, Seventh Amendment, Appointments Clause, and removal power claims); *Duka v. SEC*, No. 15 Civ. 357, 2015 WL 1943245, at *3-4, *7 (S.D.N.Y. Apr. 15, 2015) (jurisdiction over presidential removal power claim); *Bebo v. SEC*, No. 15-C-3, 2015 WL 905349, at *2 (E.D. Wis. Mar. 3, 2015) (no jurisdiction over due process, equal protection, Seventh Amendment, and removal power claims), aff'd, No. 15-1511, 2015 WL 4998489 (7th Cir. Aug. 24, 2015); *Chau v. SEC*, 72 F. Supp. 3d 417, 430, 436 (S.D.N.Y. 2014) (no jurisdiction over due process and equal protection claims); *Altman v. SEC*, 768 F. Supp. 2d 554, 562 (S.D.N.Y. 2011) (no jurisdiction over due process, equal protection, and privacy claims), aff'd, 687 F.3d 44 (2d Cir. 2012) (per curiam); *Gupta v. SEC*, 796 F. Supp. 2d 503, 513-14 (S.D.N.Y. 2011) (jurisdiction over equal protection claim, no jurisdiction over retroactivity claim).

*Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 489 (2010). Here, both considerations support the conclusion that Congress intended the statutory scheme to be exclusive.

A.

We can fairly discern Congress's intent to preclude suits by respondents in SEC administrative proceedings in the mine-run of cases. "Generally, when Congress creates procedures designed to permit agency expertise to be brought to bear on particular problems, those procedures are to be exclusive." *Free Enterprise*, 561 U.S. at 489 (internal quotation marks omitted). And the securities laws' scheme of Commission adjudication and ensuing judicial review resembles in material respects the enforcement scheme the Supreme Court found exclusive in *Thunder Basin*.

There, the Court considered a coal company's statutory and constitutional challenges to an anticipated enforcement proceeding under the Federal Mine Safety and Health Amendments Act of 1977. Under the Mine Act scheme, the Mine Safety and Health Administration investigates and sanctions violations of the Act and its regulations. *Thunder Basin*, 510 U.S. at 202-04 & n.5. The sanctioned party can bring a challenge before an ALJ and then appeal the ALJ's determination to the Federal Mine Safety and Health Review Commission, who reviews it de novo and issues a final order imposing penalties. *Id.* at 207-08. The party can then seek review of the order in a court of appeals, "whose jurisdiction 'shall be exclusive and its judgment and decree shall be final' except for possible Supreme Court review." *Id.* at 208 (quoting the Mine Act, 30 U.S.C. § 816(a)(1)). Finding that the Mine Act thus established a "detailed structure for reviewing violations," the Supreme Court held that the

scheme implicitly barred district-court jurisdiction over the coal company's pre-enforcement suit. *Id.* at 207, 216.

The securities laws contain an equally comprehensive structure for the adjudication of securities violations in administrative proceedings. Aside from the fact that the Commission, rather than the sanctioned entity, initiates the agency review process, the proceedings follow the same progression. The schemes also contain nearly identical judicial-review provisions.

The Exchange Act, for example, also provides that, once the Commission proceeding culminates in a final order, an "aggrieved" respondent may seek review in our court or the circuit where he resides or has his principal place of business. 15 U.S.C. § 78y(a)(1); *compare id.*, *with* 30 U.S.C. § 816(a)(1) (the Mine Act). The reviewing court, like the reviewing court in the Mine Act scheme, exercises "exclusive" jurisdiction to "affirm or modify and enforce or to set aside the order in whole or in part." 15 U.S.C. § 78y(a)(3); *compare id.*, *with* 30 U.S.C. § 816(a)(1). The court may consider only "objection[s] to an order or rule of the Commission" that had been "urged before the Commission" unless "there was reasonable ground for failure to do so." 15 U.S.C. § 78y(c)(1); *compare id.*, *with* 30 U.S.C. § 816(a)(1). The Exchange Act also specifies the standard of review for the Commission's factual findings, *see* 15 U.S.C. § 78y(a)(4); *compare id.*, *with* 30 U.S.C. § 816(a)(1); the process for seeking a stay of the Commission's order, *see* 15 U.S.C. § 78y(c)(2); *compare id.*, *with* 30 U.S.C. § 816(a)(2), (c); and the process for the court to remand to the agency to "adduce additional evidence," 15 U.S.C. § 78y(a)(5); *compare id.*, *with* 30 U.S.C. § 816(a)(1).

"Given the painstaking detail with which" Congress set forth the rules governing the court of appeals' review of Commission action, "it is fairly discernible that Congress intended to deny [aggrieved respondents] an additional avenue of review in district court." *Elgin*, 132 S. Ct. at 2134. In our view, moreover, it is of no moment that the securities laws provide for the possibility of civil enforcement both before the Commission *and* in federal district court. One court has thought otherwise, reasoning that "[t]here can be no 'fairly discernible' Congressional intent to limit jurisdiction away from district courts when the text of the statute provides the district court as a viable forum" for SEC enforcement actions. *Hill*, 2015 WL 4307088, at *6. Congress, though, gave *the SEC* the option to pursue violations in district court. Congress did not thereby necessarily enable *respondents in administrative proceedings* to collaterally attack those proceedings in court. In other words, Congress granted the choice of forum to the Commission, and that authority could be for naught if respondents like Jarkesy could countermand the Commission's choice by filing a court action.

B.

Jarkesy does not seriously dispute that Congress meant to channel most challenges to the Commission's administrative proceedings through the statutory review scheme. He instead argues that the particular challenges he raised in his district-court suit are not "of the type Congress intended to be reviewed within this statutory structure." *Thunder Basin*, 510 U.S. at 212. We disagree.

"To unsettle [the] presumption of initial administrative review—made apparent by the structure of the organic statute—requires a strong countervailing rationale." *E. Bridge, LLC v. Chao*, 320 F.3d 84, 89 (1st Cir. 2003). The

second step of the *Thunder Basin* framework asks whether Jarkesy's claims present such a rationale. And the Supreme Court has told us what to look for: we are to "presume" that Congress wanted the district court to remain open to a litigant's claims "if 'a finding of preclusion could foreclose all meaningful judicial review'; if the suit is 'wholly collateral to a statute's review provisions'; and if the claims are 'outside the agency's expertise.'" *Free Enterprise*, 561 U.S. at 489-90 (quoting *Thunder Basin*, 510 U.S. at 212-13). We do not understand those considerations to form three distinct inputs into a strict mathematical formula. Rather, the considerations are general guideposts useful for channeling the inquiry into whether the particular claims at issue fall outside an overarching congressional design. Here, each of the guideposts points in the same direction.

1.

We first address Jarkesy's argument that his challenges cannot receive "meaningful review" within the securities laws' scheme. Jarkesy offers several reasons why that is allegedly the case. Among them, he contends that the Commission lacks the authority to rule on certain of his claims, which he frames as facial attacks on Dodd-Frank's amendments to the securities laws based on the Seventh Amendment and the non-delegation doctrine.

The government maintains that Jarkesy never raised those claims before the district court. The district court evidently agreed. Indeed, the court found that it lacked jurisdiction in part *because* it did not understand Jarkesy to be raising a facial challenge. *See Jarkesy*, 48 F. Supp. 3d at 39.

We, too, reject Jarkesy's assertion that that he lodged a facial attack on Dodd-Frank based on the Seventh Amendment—*i.e.*, a challenge to Congress's enabling the

Commission to obtain enhanced penalties in an administrative proceeding. In his complaint, Jarkesy referenced the Seventh Amendment only in developing the fundamental-rights angle of one of his equal protection theories. *See* Compl. ¶¶ 26-30 (J.A. 15). And in another filing below, Jarkesy expressly disclaimed making a facial Seventh Amendment challenge to the availability of more severe penalties in the agency setting, stating: "To be clear, Plaintiffs do not here complain that *Congress* had no right to separate them from their Seventh Amendment rights by designating securities fraud enforcement actions for adjudication in an administrative forum." *See* J.A. 75-76 (memorandum in support of motion for a temporary restraining order).

Whether Jarkesy properly asserted a facial challenge based on the non-delegation doctrine presents a closer question. His complaint hints at such a challenge in passing. *See* Compl. ¶ 2 (J.A. 8-9) ("The SEC . . . has usurped a legislative prerogative, violating the constitutional separation of powers."). He put forth a non-delegation argument in his memorandum in support of his motion for a temporary restraining order. *See* J.A. 78-82. Jarkesy also described his separation-of-powers claim as attacking "the facial validity of a statutory scheme" in his briefing responding to the district court's notice to show cause. J.A. 263-64. That said, we appreciate the government's point that if Jarkesy really meant to assert a facial challenge, he would have done well to at least mention Dodd-Frank or cite the relevant statutes in his complaint. If the district court misunderstood the nature of Jarkesy's intended claim, its confusion was understandable.

In any case, assuming *arguendo* that Jarkesy adequately put forth a non-delegation challenge, he is wrong to assign it talismanic significance. He seems to assume that whenever a respondent in an administrative proceeding attacks a statute

on its face, a district court has jurisdiction to hear the challenge, whereas the agency does not. That is mistaken. To be sure, the Supreme Court has noted that "adjudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies." *Thunder Basin*, 510 U.S. at 215 (brackets omitted). But the *Thunder Basin* Court did not find that consideration to be determinative of whether the company's constitutional claims could receive meaningful review within the Mine Act scheme. *Id.* And the Court's recent decision in *Elgin v. Department of Treasury* reiterated that, so long as a court can eventually pass upon the challenge, limits on an agency's own ability to make definitive pronouncements about a statute's constitutionality do not preclude requiring the challenge to go through the administrative route. 132 S. Ct. at 2136-37.

*Elgin* concerned the Civil Service Reform Act (CSRA), which sets forth a comprehensive structure for reviewing personnel actions taken against federal employees. Under the CSRA, federal employees who suffer adverse employment actions may seek a hearing before the Merit Systems Protection Board (MSPB), whose decision is then reviewed by the Federal Circuit. *Id.* at 2130-31. The plaintiffs in *Elgin* were male employees who had been discharged because they failed to register for the military draft. *Id.* at 2131. While one employee (Elgin) sought a hearing under the CSRA, he did not pursue the proceedings past the ALJ's initial ruling against him. All the employees filed suit in federal district court instead. *Id.* They claimed that the Military Selective Service Act and the corresponding statute barring them from federal employment were facially unconstitutional under the Equal Protection and the Bill of Attainder Clauses. *Id.*

In the employees' view, Congress could not have intended for them to pursue their facial constitutional challenges through the CSRA route, in part because the ALJ who initially ruled on Elgin's claims agreed that the MSPB lacked authority to determine the constitutionality of those statutes. *Id.* at 2131, 2136. Though the Supreme Court reserved judgment on whether the ALJ was correct, the Court made clear that it did not matter: even if the MSPB could not declare the statutes unconstitutional, the Federal Circuit could. *Id.* at 2136-37. Because the employees' challenges "could be meaningfully addressed in the Court of Appeals that Congress had authorized to conduct judicial review," the *Elgin* Court was confident that Congress intended them to go through the agency proceedings first. *Id.* at 2137 (internal quotation marks omitted).

So too, here. Because Jarkesy's constitutional claims, including his non-delegation challenge to Dodd-Frank, can eventually reach "an Article III court fully competent to adjudicate" them, it is of no dispositive significance whether the Commission has the authority to rule on them in the first instance during the agency proceedings. *Id.* at 2137; *see Bebo*, 2015 WL 4998489, at *6-7. Indeed, courts of appeals often consider facial constitutional claims—including separation-of-powers claims—in reviewing final orders from the Commission. *See Am. Power & Light Co. v. SEC*, 329 U.S. 90, 96-108 (1946) (addressing Commerce Clause, non-delegation, and due process challenges); *Blinder, Robinson & Co., Inc. v. SEC*, 837 F.2d 1099, 1103-04 (D.C. Cir. 1988) (addressing removal powers challenge); *Sorrell v. SEC*, 679 F.2d 1323, 1325-26 (9th Cir. 1982) (addressing challenge that Congress unconstitutionally delegated legislative power to a private entity). Jarkesy would not need to blaze a new trail.

In support of his entitlement to the district court's attention now, Jarkesy invokes another recent Supreme Court decision, *Free Enterprise Fund v. Public Company Accounting Oversight Board*. 561 U.S. 477 (2010). In *Free Enterprise*, an accounting firm (joined by an advocacy organization) brought suit against the Public Company Accounting Oversight Board (PCAOB), an entity created by the Sarbanes-Oxley Act and placed under SEC oversight. *Id.* at 484-87. The firm claimed that the PCAOB's structure infringed upon the president's removal power and that its members had been appointed in contravention of the Appointments Clause. *Id.* at 487. The accounting firm was registered with the PCAOB, and a PCAOB inspection had uncovered deficiencies in the firm's audits. At the time the firm filed its district-court action, however, the PCAOB had only opened an investigation. *Id.*

The government argued that the district court lacked jurisdiction to hear the firm's suit. It reasoned that, because the Sarbanes-Oxley Act empowered the Commission to review any PCAOB rule or sanction, *see* 15 U.S.C. § 7217(b)(2)-(4), (c)(2), and because parties can challenge either a "final rule" or a "final order" of the Commission in a court of appeals pursuant to 15 U.S.C. § 78y, the accounting firm should have pursued its constitutional challenge through that route instead. *Free Enterprise*, 561 U.S. at 489.

The Supreme Court rejected the government's argument that § 78y implicitly barred the accounting firm's pre-enforcement suit. *See id.* at 489-91. Key to the Court's reasoning was that, to bring itself within the PCAOB and Commission scheme, the firm would have needed to manufacture a dispute or provoke a sanction. The Court was highly skeptical that Congress could have intended to require doing so. "Requiring petitioners to select and challenge a

Board rule at random is an odd procedure for Congress to choose," the Court explained. *Id.* at 490. The plaintiffs "object to the Board's existence, not to any of its auditing standards"; and moreover, "only *new* rules, and not existing ones, are subject to challenge." *Id.* The Court also dismissed the government's suggestion that the accounting firm could obtain review by deliberately incurring a PCAOB sanction. "If the Commission then affirms [the sanction], the firm will win access to a court of appeals—and severe punishment should its challenge fail. We normally do not require plaintiffs to 'bet the farm . . . by taking the violative action' before 'testing the validity of the law.'" *Id.* (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007)). For those reasons, the Court determined that the plaintiffs could not "meaningfully pursue" their constitutional challenges through the administrative scheme. *Id.*

Although *Free Enterprise*, like this case, happened to involve the Exchange Act's judicial-review provision, the considerations animating the Court's decision in *Free Enterprise* are absent here. To have his claims heard through the agency route, Jarkesy would not have to erect a Trojan-horse challenge to an SEC rule or "bet the farm" by subjecting himself to unnecessary sanction under the securities laws. Jarkesy is already properly before the Commission by virtue of his alleged violations of those laws. Indeed, the existence of the enforcement proceedings gave rise to Jarkesy's challenges. And, should the Commission's final order run against him, a court of appeals is available to hear those challenges. Thus, by contrast to *Free Enterprise*, the SEC scheme presents an entirely "meaningful" avenue of relief to respondents like Jarkesy. The oddities that led the Supreme Court to believe that Congress could not possibly have intended the accounting firm to proceed through the

administrative route are not present in this case. *See Bebo*, 2015 WL 4998489, at *9.

For similar reasons, Jarkesy's case falls outside the Court's decision in *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479 (1991), which he also invokes. In *McNary*, undocumented aliens who had been denied special agricultural worker (SAW) status filed a class action claiming that the Immigration and Naturalization Service's procedures implementing the SAW program violated the Due Process Clause. *Id.* at 487. A provision of the Immigration and Nationality Act (INA) barred judicial review "'of a determination respecting an application' for SAW status," except in the course of a court of appeals' review of an alien's final order of deportation. *Id.* at 485-86, 491-92 (emphasis omitted) (quoting 8 U.S.C. § 1160(e)(1)).

The Supreme Court upheld the district court's jurisdiction to consider the plaintiffs' challenge to the program's implementation. It first found that the text of the INA provision—by referencing "a determination respecting an application" for SAW status and stating that "judicial review of such a denial" could occur only in the context of a deportation proceeding—did not encompass broad procedural challenges to the program itself. *Id.* at 491-94 (emphasis omitted). In supporting its textual holding, the Court further reasoned that, if the plaintiffs' claim could reach a court only by way of a SAW-application denial and a deportation order, their challenge would be effectively foreclosed. "[M]ost aliens denied SAW status," the Court explained, "can ensure themselves review in courts of appeals only if they voluntarily surrender themselves for deportation. Quite obviously, that price is tantamount to a complete denial of judicial review for most undocumented aliens." *Id.* at 496-97. The Court also found it significant that the record from a single alien's SAW

application and deportation proceeding would be unlikely to contain the kind of evidence needed to make a systematic challenge to the agency's practices. *Id.* at 497. Considering it "most unlikely that Congress intended to foreclose all forms of meaningful judicial review" of the plaintiffs' due process claim, the Court found that the district court remained open to hear their case. *Id.* at 496, 498-99.

Once again, Jarkesy's situation does not share the characteristics that led the Court to permit a judicial challenge outside the administrative scheme. In *McNary*, as in *Free Enterprise*, the Court balked at an administrative scheme that forced would-be plaintiffs to "bet the farm"—specifically, their ability to reside in the United States. Jarkesy is not put to any such risk here. The Seventh Circuit similarly found that delayed review of *existing* administrative proceedings did not give rise to the sorts of concerns that justified district-court jurisdiction in *McNary* and *Free Enterprise*. *Bebo*, 2015 WL 4998489, at *9 & n.3. The high price of accessing review in those cases, the Seventh Circuit explained, was "[t]he key factor" supporting district-court jurisdiction. *Id.* at *9.

Unlike *McNary*, moreover, this is not a case in which meaningful judicial review likely would be thwarted by an inadequate factual record. Jarkesy thinks otherwise, predicting that later court-of-appeals review will prove "impossible" because some of his challenges will require factual development. Appellants Br. 53. His equal protection class-of-one challenge, for instance, will require fact finding about the Commission's decision to institute the administrative proceeding against him. And Jarkesy argues that the SEC's Rules of Practice categorically disallow the type of discovery he needs to present evidence corroborative of his allegations, pointing to the fact that the ALJ denied

several of his subpoena requests seeking, among other things, internal Commission records regarding its charging decisions.

We find Jarkesy's concerns unsubstantiated. For one thing, the record in his proceeding belies the assertion that the SEC's Rules of Practice categorically preclude him from accessing the evidence he believes he needs. The Rules permit any party in the proceeding to request the issuance of a subpoena for "documentary or other tangible evidence" or for a witness to give testimony. 17 C.F.R. § 201.232(a). True, the ALJ denied Jarkesy's requests for the issuance of subpoenas regarding his equal protection and prejudgment challenges. *See* John Thomas Capital Mgmt. Grp., Admin. Proceedings Release No. 1242, at 1-2 (ALJ Feb. 14, 2014). But the judge's decision rested on the context-specific ground that Jarkesy's requests were untimely and unreasonable because they requested evidence "largely consisting of privileged internal Commission deliberations." *Id.* at 2. Those kinds of bars to discovery are hardly unique to the SEC's rules—Jarkesy's requests might well have met the same result had he attempted them in district court. *See Chau*, 72 F. Supp. 3d at 432.

In any event, Jarkesy has appealed the ALJ's discovery rulings to the full Commission, arguing that the ALJ *misapplied* the Rules of Practice. *See* John Thomas Capital Mgmt. Grp., Exchange Act Release No. 74,345, 2015 WL 728006, at *3 (Feb. 20, 2015). If he's right, the Commission stands ready to correct the ALJ's errors in due course. *Id.* Jarkesy can also file—and has filed—a motion with the Commission "for leave to adduce additional evidence" at any time before the Commission's final decision. 17 C.F.R. § 201.452; *see* John Thomas Capital Mgmt. Grp., 2015 WL 728006, at *3.

Should Jarkesy's fears come to pass, however, and should the record in the administrative proceeding prove inadequate to the court of appeals considering his attacks on the Commission's final order, that court "always has the option" of "remanding to the agency for further factual development." *John Doe, Inc. v. Drug Enforcement Admin.*, 484 F.3d 561, 570 (D.C. Cir. 2007). As noted, the Exchange Act's judicial-review provision expressly allows for that to happen. *See* 15 U.S.C. § 78y(a)(5). The court of appeals also has the ability to "take judicial notice of facts relevant to the constitutional question[s]." *Elgin*, 132 S. Ct. at 2138. For those reasons, the *Elgin* Court dismissed the plaintiff-employees' near-identical argument as overblown. The Court was confident that the CSRA scheme could accommodate any fact finding necessary to resolve their constitutional challenges. *Id.* at 2138 & n.9. We have the same faith in the system of administrative and judicial review set forth in the securities laws.

As a result, "a finding of preclusion" would not "foreclose all meaningful judicial review" of Jarkesy's claims. *Free Enterprise*, 561 U.S. at 489 (quoting *Thunder Basin*, 510 U.S. at 212-13). In its recent decision, the Seventh Circuit declined to find district-court jurisdiction on that basis alone, which the court viewed to be the "most critical" factor. *Bebo*, 2015 WL 4998489, at *8. Because we approach the various factors as guideposts for a holistic analysis, we proceed to examine the remaining considerations without assessing whether the capacity for meaningful review would alone suffice to negate jurisdiction.

2.

We next consider the (related) question of whether Jarkesy's claims are "wholly collateral" to the securities laws'

scheme. *See Elgin,* 132 S. Ct. at 2136, 2139; *Free Enterprise*, 561 U.S. at 489-90 (combining consideration of "wholly collateral" and "meaningful judicial review" factors). Jarkesy asserts that, in his court action, he "is not complaining about *anything* that happened as part of, and during the pendency of, the administrative proceeding." Appellants Reply Br. 13. That is simply incorrect. Putting aside his purported facial challenge to Dodd-Frank, the remainder of Jarkesy's claims concern (what he perceives to be) substantive or procedural deficiencies in the Commission's enforcement of the securities laws against him to this point.

He attacks the Commission's decision to place him in administrative proceedings in the first place, Compl. ¶¶ 25-38 (J.A. 14-17); the Commission's alleged prejudgment of his case by accepting the settlement of his co-respondents, *id.* ¶¶ 17-24 (J.A. 13-14); the Commission's alleged ex parte communications with the SEC Enforcement Division; *id.* ¶¶ 39-46 (J.A. 17-19), and the Division's alleged *Brady* violations, *id.* ¶¶ 47-59 (J.A. 19-22). We agree with the district court that those claims are "inextricably intertwined with the conduct of the very enforcement proceeding the statute grants the SEC the power to institute and resolve as an initial matter." *Jarkesy*, 48 F. Supp. 3d at 38.

Jarkesy suggests another definition of "wholly collateral," arguing that any challenge "independent of and irrelevant to the securities fraud allegations" against him should count. Appellants Br. 20-21; *accord Gupta*, 796 F. Supp. 2d at 513. But that broad definition misconceives how the Supreme Court and our court have understood the term "wholly collateral" in the *Thunder Basin* line of cases.

*Elgin*, for instance, asked whether the plaintiff-employees' challenge aimed to obtain the same relief they

could seek in the agency proceeding: "As evidenced by their district court complaint, petitioners' constitutional claims are the vehicle by which they seek to reverse the removal decisions, to return to federal employment, and to receive the compensation they would have earned but for the adverse employment action." 132 S. Ct. at 2139-40. Similarly, in *Heckler v. Ringer*, 466 U.S. 602 (1984), in finding that the plaintiffs' constitutional and statutory claims were not "collateral" to a scheme of administrative and judicial review of Medicare payment decisions, the Supreme Court explained that the plaintiffs' challenge to the agency's "procedure" for making those decisions was, "at bottom," an attempt to reverse the agency's decisions denying their benefits claims. *Id.* at 614, 618, *cited in Elgin*, 132 S. Ct. at 2140. By contrast, in *Free Enterprise*, the Court found that the plaintiffs' pre-enforcement Article II claims were "collateral" to the SEC administrative-review scheme because the *Free Enterprise* plaintiffs were not *in* that scheme at all; hence, their general challenge to the PCAOB's existence was "collateral to any Commission orders or rules from which [judicial] review might be sought." 561 U.S. at 490 (internal quotation marks omitted).

Here, Jarkesy's constitutional and APA claims do not arise "outside" the SEC administrative enforcement scheme—they arise from actions the Commission took in the course of that scheme. And they are the "vehicle by which" Jarkesy seeks to prevail in his administrative proceeding. *Elgin*, 132 S. Ct. at 2139-40. Indeed, Jarkesy pressed the same claims as affirmative defenses before the ALJ, and pressed them again to the Commission on review of the ALJ's initial decision. It is "difficult to see how [the claims] can still be considered 'collateral to any Commission orders or rules from which review might be sought,' since the ALJ and the Commission will, one way or another, rule on those claims and it will be

the Commission's order that [Jarkesy] will appeal." *Tilton*, 2015 WL 4006165, at \*12 (citation omitted) (quoting *Free Enterprise*, 561 U.S. at 490) (some internal quotation marks omitted). The result might be different if a constitutional challenge were filed in court before the initiation of any administrative proceeding (and the plaintiff could establish standing to bring the judicial action). *See Free Enterprise*, 561 U.S. at 490. Here, however, Jarkesy brought this action after the Commission had initiated its enforcement proceeding against him, and he seeks to challenge multiple aspects of that ongoing proceeding.

Instead of seeing that process through to its conclusion, Jarkesy seeks to terminate the proceeding altogether. He asks our court to declare the ongoing proceeding against him "void" and requests that we "enjoin any further administrative enforcement proceedings against [him] relating to the subject matter of the Order Instituting Proceedings." Appellants Br. 61. Our court has previously rejected similar attempts by respondents in agency proceedings "to short-circuit the administrative process through the vehicle of a district court complaint." *Sturm, Ruger & Co., Inc. v. Chao*, 300 F.3d 867, 876 (D.C. Cir. 2002) (internal quotation marks omitted). What we said there also applies here: "Rather than allowing the statutory review process to run its course—a course that will eventually lead back to a court of appeals," Jarkesy has "sought to make an end run around that process by going directly to district court. . . . Our obligation to respect the review process established by Congress bars us from permitting [Jarkesy] to make this end run, and requires dismissal of [his] district court complaint." *Id.*

To be sure, in *Free Enterprise*, the Supreme Court sustained district-court jurisdiction over the plaintiffs' facial constitutional challenge to Sarbanes-Oxley. And at one point,

in explaining why the plaintiffs' challenge in that case was "collateral" to any Commission rules or orders, the Court characterized the claim as an "object[ion] to the [PCAOB's] existence." 561 U.S. at 490. One could ask whether Jarkesy's facial attack on Dodd-Frank is of the same kind and should lead to the same result.

We do not read the *Free Enterprise* Court's characterization of the plaintiffs' claims in that case, however, to define a new category of collateral claims that fall outside an otherwise exclusive administrative scheme. In its subsequent decision in *Elgin*, the Court considered and rejected the idea that one could divine an exception to an otherwise exclusive administrative scheme based on the distinction between various types of constitutional challenges. "[A] jurisdictional rule based on the nature of an employee's constitutional claim would deprive the aggrieved employee, the MSPB, and the district court of clear guidance about the proper forum for the employee's claims at the outset of the case," the Court wrote, dismissing the plaintiffs' proposed line between constitutional challenges to statutes and other types of constitutional arguments to be "hazy at best and incoherent at worst." *Elgin*, 132 S. Ct. at 2135. The *Elgin* Court also rejected the dissent's proffered rule making an exception to the CSRA scheme specifically for *facial* attacks on statutes. *Id.* at 2135-36. The Court explained that "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." *Id.* (quoting *Citizens United v. FEC*, 558 U.S. 310, 331 (2010)). "By contrast," the *Elgin* Court reasoned, "a jurisdictional rule based on the type of employee and adverse agency action at issue does not involve such amorphous distinctions." *Id.* at 2136.

As Jarkesy's suit illustrates, parsing and categorizing a litigant's claim at the outset can prove highly difficult (especially if the litigant's formulation shifts along the way). Like the *Elgin* majority, we believe that Congress did not intend the framing of a constitutional challenge—based on potentially "hazy," "amorphous," and "incoherent" categories—to grant a district court jurisdiction over an otherwise non-collateral claim. *Id.* at 2135-36. Jurisdictional rules, the Supreme Court has intimated, should be straightforward to apply if possible. *See Hertz Corp. v. Friend*, 559 U.S. 77, 94-95 (2010). But the approach suggested by Jarkesy would do the opposite, inviting unpredictable litigation at the threshold about whether the particular challenges at issue fall within or without an indistinct category of constitutional claims.

Such an approach would also tend to run counter to important principles of judicial restraint. Out of respect for the political branches, courts generally avoid ruling on constitutional grounds when possible. *See, e.g.*, *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 346-47 (1936) (Brandeis, J., concurring). Facial challenges to statutes are especially disfavored. *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450-51 (2008). Yet an exception to an otherwise exclusive scheme for constitutional challenges in general, or facial attacks on a statute in particular, or some other as-yet-undefined category of constitutional claims, would encourage respondents in administrative enforcement proceedings to frame their challenges to the Commission's actions in those terms and thereby earn access to another forum in which to advance their arguments. We doubt Congress intended that result. The mere fact that Jarkesy presses constitutional claims (even facial ones) therefore does not control the preclusion inquiry.

Certain of Jarkesy's challenges—namely, his non-delegation doctrine claim and his equal protection arguments—could be said to share another characteristic: if vindicated, the upshot (arguably) would be that Jarkesy should not have been subjected to the administrative proceeding at all. And some district courts, facing similar claims by respondents in SEC proceedings, have found that consideration significant to the jurisdictional inquiry. *See Duka*, 2015 WL 1943245, at *5; *Gupta*, 796 F. Supp. 2d at 514. Because the SEC respondents in those cases, like Jarkesy, were alleging harm by virtue of having to undergo a constitutionally deficient proceeding, and because a later court-of-appeals decision in the respondent's favor could not fully remedy that harm, those courts determined that the respondents need not "endure the very proceeding[s]" that they find constitutionally deficient before seeking a remedy in court. *Gupta*, 796 F. Supp. 2d at 514.

That concern might be viewed to indicate a "collateral" claim; or, alternatively, it might be viewed to suggest an absence of meaningful judicial review (or both). *See Free Enterprise*, 561 U.S. at 489-90. Regardless, in our view, the fact that Jarkesy's claims attack the process rather than the result does not mean his claims should receive preemptive resolution in a district court. Requiring Jarkesy to undergo the remainder of the proceeding, notwithstanding his threshold claim that it was wrongly initiated, aligns with how the law handles analogous claims in similar contexts. *See Bebo*, 2015 WL 4998489, at *9.

In *FTC v. Standard Oil Co. of California*, 449 U.S. 232 (1980), an oil company brought suit against the Federal Trade Commission alleging that the FTC had issued a complaint against the company without a reasonable basis. *Id.* at 234-35. The Supreme Court determined that the FTC's issuance

of the complaint was neither a final agency action under the APA nor a collateral order under the doctrine of *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949). *Standard Oil*, 449 U.S. at 238, 246. Consequently, the Court held that the district court lacked jurisdiction over Standard Oil's suit before the conclusion of the FTC enforcement proceedings. *Id.* at 246-47. In so finding, the Court was unmoved by the company's claims of irreparable harm due to "the expense and disruption of defending itself in protracted adjudicatory proceedings" that the company believed never should have begun. *Id.* at 244. Though the Court did not doubt that Standard Oil faced a substantial burden, the Court responded that "the expense and annoyance of litigation is part of the social burden of living under government." *Id.* (internal quotation marks omitted).

Subsequently, in *USAA Federal Savings Bank v. McLaughlin*, 849 F.2d 1505 (D.C. Cir. 1988), our court applied *Standard Oil* to dismiss a bank's pre-enforcement suit claiming that an agency was wrongly asserting jurisdiction over it. *Id.* at 1506, 1508. Though the bank "[had] been called upon, much to its chagrin, to participate in a proceeding that lies beyond what [it] believes to be [the agency's] lawful powers," we nonetheless concluded that jurisdiction did not lie. *Id.* at 1510. If "the 'injury' inflicted on the party seeking review is the burden of going through an agency proceeding," we held, then "[*Standard Oil*] teaches that the party must patiently await the denouement of proceedings within the Article II branch." *Id.*

That principle applies in the criminal context as well. There is "inevitable injury—often of serious proportions—incident to any criminal prosecution." *Schlesinger v. Councilman*, 420 U.S. 738, 754 (1975). Yet "the cost, anxiety, and inconvenience of having to defend against a

single criminal prosecution" do not constitute irreparable injury warranting a federal court's intervention in an ongoing state prosecution, even if that prosecution imperils constitutional rights. *Younger v. Harris*, 401 U.S. 37, 46 (1971). True, *Younger* abstention is grounded in considerations of federalism not implicated here. But the rule derives from "the basic doctrine of equity jurisprudence that courts of equity should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury." *Id.* at 43-44; *see Deaver v. Seymour*, 822 F.2d 66, 70 (D.C. Cir. 1987).

Likewise, when a district court denies a federal criminal defendant's pretrial motion, that denial ordinarily is not immediately appealable. The defendant must stand trial first. *See Deaver*, 822 F.2d at 70; 6 Wayne R. LaFave et al., *Criminal Procedure* § 27.2(b), at 9 (3d ed. 2007). That general rule against interlocutory appeals encompasses selective-prosecution claims, which bear a close resemblance to Jarkesy's class-of-one equal protection challenge. Notwithstanding that "[a] selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution," *United States v. Armstrong*, 517 U.S. 456, 463 (1996), defendants assert such challenges in the course of the prosecution (usually pretrial), *see* 4 LaFave, *supra*, § 13.4(a), at 170-71, and courts of appeals address the matter only after a conviction, *see, e.g.*, *United States v. Mangieri*, 694 F.2d 1270, 1272-76 (D.C. Cir. 1982).

It makes sense that Congress would design the Commission's enforcement proceedings to work the same way. The rule against piecemeal criminal appeals has some

exceptions—interlocutory appeals can lie over double jeopardy claims, for instance. *See Abney v. United States*, 431 U.S. 651, 662 (1977). But our court in *Deaver* seriously doubted that a defendant's separation-of-powers challenge to an independent counsel's authority was among them. 822 F.2d at 70-71. The *Deaver* court reasoned that, unlike a defendant claiming double jeopardy, "Deaver does not assert a constitutional right not to stand trial, but merely claims that [the independent counsel] is not qualified to direct the prosecution. Assuming *arguendo* Deaver's contention is correct, his rights can be vindicated by a reversal of any conviction." *Id.* at 71.

We find the *Deaver* court's reasoning persuasive, and Jarkesy's non-delegation claim is no different. Even assuming Jarkesy is right that Congress has unconstitutionally delegated power to the SEC to decide whether to place him in an administrative proceeding rather than in a court action, Jarkesy has no inherent right to avoid an administrative proceeding at all. Thus, "his rights can be vindicated by a reversal" of the Commission's final order if the court of appeals grants his petition for review. *Id.* at 71.

Of course, should Jarkesy *prevail* in his administrative proceeding, his claims would never reach a court of appeals. But the possibility that a Commission order in his favor might moot some or all of his challenges does not make those challenges "collateral" and thus appropriate for review outside the administrative scheme. *See Bebo*, 2015 WL 4998489, at *7. Again, precedent illustrates the point. In *Standard Oil*, the court of appeals had found jurisdiction over the company's case by reasoning that, if the court did not review its challenge to the FTC's complaint at that time, "the alleged unlawfulness would be moot if [Standard Oil] prevailed in the adjudication." 449 U.S. at 244 n.11. But the

Supreme Court found that possibility to be a *feature* of the administrative-exhaustion requirement, not a bug: "[O]ne of the principal reasons to await the termination of agency proceedings," the Court explained, is "to obviate all occasion for judicial review." *Id.* The same holds true for challenges with "far-ranging and troubling constitutional implications." *See Deaver*, 822 F.2d at 71. As in *Standard Oil* and *Deaver*, "the possibility that [Jarkesy's] challenge may be mooted in adjudication warrants the requirement that [he] pursue adjudication, not shortcut it." *Standard Oil*, 449 U.S. at 244 n.11.

We do not read the Supreme Court's decision in *Mathews v. Eldridge*, 424 U.S. 319 (1976), to require concluding otherwise. The *Eldridge* Court upheld district-court jurisdiction over a plaintiff's claim of entitlement to a hearing prior to the termination of his Social Security benefits, even though the plaintiff had failed fully to exhaust his administrative remedies before filing suit. *Id.* at 324-25, 327-32. The Court, however, focused on the unique nature of the plaintiff's due process claim. That challenge "rest[ed] on the proposition that full relief cannot be obtained at a postdeprivation hearing," because "an erroneous termination would damage him in a way not recompensable through retroactive payments." *Id.* at 331. The plaintiff's claim of entitlement to a pre-termination hearing thus was "entirely collateral" to his claim of entitlement to benefits: even if he succeeded on the latter claim and eventually received the benefits, the independent harm caused by the delay would remain. *Id.* at 330-31. In other words, a court's subsequent decision "would not answer his constitutional challenge" to the delay itself. *Id.* at 332. In order to afford Eldridge meaningful review of his claim, the Court excused his failure to exhaust and found that the district court had jurisdiction.

*Id.* at 332; *see Thunder Basin*, 510 U.S. at 213 (describing the facts in *Eldridge*).

As we have discussed, Jarkesy's claims do not present the same problem. The only independent harms Jarkesy will face as a result of his continuing to undergo the Commission proceeding are the burdens abided by any respondent in an enforcement proceeding or any criminal defendant who must wait for vindication. The judicial system tolerates those harms, and they are insufficient for us to infer an exception to an otherwise exclusive scheme.

3.

Finally, Jarkesy argues that Congress could not have meant to channel his claims through the SEC proceeding because they fall outside the Commission's area of expertise. "While the agency may have well mastered the securities regulations it administers," he argues, "it would be improvident to regard the Commission as a citadel of constitutional scholarship." Appellants Br. 58.

Jarkesy underestimates the Commission. He narrowly focuses on the Commission's expertise in the securities laws it applies. And he overlooks the Commission's development of concurrent familiarity in issues that regularly arise in the course of its proceedings. Jarkesy's proceeding is a case in point.

In declining to certify for interlocutory review Jarkesy's argument that the Commission should be disqualified from ruling on his case, the ALJ explained that the question whether a Commission order accepting a co-respondent's settlement prejudges another respondent's guilt has "long since been settled and addressed in numerous opinions of courts and of the Commission." John Thomas Capital Mgmt.

Grp., Admin. Proceedings Release No. 1170, at 2 (ALJ Jan. 14, 2014). In denying his petition for interlocutory review, the Commission also noted that it had "rejected arguments similar to" Jarkesy's "in an unbroken line of decisions." John Thomas Capital Mgmt. Grp., Securities Act Release No. 9519, 2014 WL 294551, at *2 (Jan. 28, 2014). Similarly, in its initial decision, the ALJ considered and rejected Jarkesy's equal protection arguments, finding it "well established" under Commission and judicial precedent that a lack of jury trials in SEC proceedings does not violate the Seventh Amendment and further finding Jarkesy's class-of-one theory deficient based in part on analysis in an earlier Commission decision. John Thomas Capital Mgmt. Grp., Initial Decision Release No. 693, 2014 WL 5304908, at *6 (ALJ Oct. 17, 2014).

Because the Commission has proven fully capable of considering Jarkesy's attacks on the fairness of his proceeding—at least in the first instance—nothing about the nature of those claims strongly suggests that Congress would have wanted to carve them out of the administrative scheme. To the contrary, the majority of Jarkesy's challenges lie firmly within the Commission's ordinary course of business.

The Commission arguably has less experience with issues like Jarkesy's non-delegation challenge. And Jarkesy once again invokes *Free Enterprise*, in which the Supreme Court noted, in finding jurisdiction, that the accounting firm's Article II arguments fell "outside the Commission's competence and expertise." 561 U.S. at 491. *Elgin* later clarified, however, that an agency's relative level of insight into the *merits* of a constitutional question is not determinative.

The federal-employee plaintiffs in *Elgin*—ultimately joined by the dissent—had argued that their equal protection and bill-of-attainder challenges to the Selective Service statutes "[did] not remotely implicate the [MSPB's] administrative expertise," because those challenges "have nothing to do with the statutory rules of federal employment, and nothing to do with any application of the 'merit system principles' or the 'prohibited personnel practices' that the [MSPB] administers." *Elgin*, 132 S. Ct. at 2143 (Alito, J., dissenting). The Court did not dispute the dissent's assessment of the MSPB's expertise. But it explained that the plaintiffs were overlooking "the many threshold questions that may accompany a constitutional claim and to which the MSPB can apply its expertise." *Id.* at 2140. The Court pointed out that the MSPB could "obviate the need to address the [facial] constitutional challenge" at all if the MSPB were to resolve the case on other grounds, including by addressing other statutory or constitutional claims. *Id.* In addition, "the challenged statute may be one that the MSPB regularly construes, and its statutory interpretation could alleviate constitutional concerns." *Id.* "Thus, because the MSPB's expertise can otherwise be 'brought to bear' on employee appeals that challenge the constitutionality of a statute," the Court saw "no reason to conclude that Congress intended to exempt such claims from exclusive review before the MSPB and the Federal Circuit." *Id.* (citing *Thunder Basin*, 510 U.S. at 214-15).

Here, likewise, the Commission's expertise "can otherwise be brought to bear on" the issues in Jarkesy's proceeding. As previously discussed, the agency could moot the need to resolve Jarkesy's challenge to Dodd-Frank's constitutionality (or any other constitutional question) by finding that he did not commit the securities-law violations of which he stands accused. Even short of that, the Commission

could offer an interpretation of the securities laws in the course of the proceeding that might answer or shed light on Jarkesy's non-delegation challenge. As our court has previously observed, "there are precious few cases involving interpretation of statutes authorizing agency action in which our review is not aided by the agency's statutory construction." *Mitchell v. Christopher*, 996 F.2d 375, 379 (D.C. Cir. 1993). Accordingly, like the *Elgin* Court, "we see no reason to conclude that Congress intended to exempt" Jarkesy's non-delegation challenge, or any of his other constitutional defenses, from the administrative scheme. 132 S. Ct. at 2140.

\* \* \*

Having canvassed the three considerations the Supreme Court outlined in *Thunder Basin*, none dissuades us from our initial conclusion that Congress has implicitly precluded the district court's jurisdiction over cases of this type. Quite the contrary. The rationale underlying Congress's decision to create statutory schemes like the one before us is that "coherence and economy are best served if all suits pertaining to designated agency decisions are segregated in particular courts," *City of Rochester*, 603 F.2d at 936—here, in a court of appeals after a final Commission decision. And the "policy behind having a special review procedure in the first place similarly disfavors bifurcating jurisdiction over various substantive grounds," due to the "likelihood of duplication and inconsistency." *Id.*

As the recent slew of cases demonstrates (*see supra* note \*), Jarkesy's case is hardly unique. Many respondents in SEC proceedings join substantive defenses to their securities charges together with challenges to the Commission's actions or authority. It makes good sense to consolidate all of each

respondent's issues before one court for review, and only after an adverse Commission order makes that review necessary. By contrast, a system like the one Jarkesy envisions—where respondents "'jump the gun' by going directly to the district court to develop their case" instead of seeing agency proceedings through to conclusion, *John Doe, Inc.*, 484 F.3d at 570—has comparatively little merit. Such a system, we have already noted, would create substantial uncertainty about what sort of claims could properly be adjudicated outside the administrative scheme. *See Elgin*, 132 S. Ct. at 2135-36. And—again, as Jarkesy's case has shown—it could also likely result in parallel litigation of the same issues before a district court and an agency, with two courts of appeals possibly being confronted with two different sets of rulings down the road. *Cf. id.* at 2135.

We cannot conclude Congress had that intent. Jarkesy must continue to press his various challenges to the Commission's enforcement proceeding before the Commission itself. Should the agency's final order be adverse to him, Jarkesy can then raise his challenges in a petition for review to a court of appeals.

## III.

Jarkesy has offered alternate sources of jurisdiction during the course of this appeal. In his opening brief, Jarkesy warned our court that the Commission had expedited his administrative proceeding, a move he thought could "threaten[] to obstruct the appellate jurisdiction of this Court to resolve these claims." Appellants Br. 62. Jarkesy suggested that the Commission's fast-tracking might have required "the exercise of this Court's powers under the All Writs Act to protect its jurisdiction," on the theory that the Commission could issue its final order before our court could

render a decision on the merits of Jarkesy's claims. *Id.* at 62-63 (citation omitted); *see* 28 U.S.C. § 1651(a). In light of our determination that we, like the district court, lack any jurisdiction over those claims that might need protection, we decline Jarkesy's invitation. "While the All Writs Act authorizes employment of extraordinary writs, it confines the authority to the issuance of process 'in aid of' the issuing court's jurisdiction. . . . [T]he Act does not enlarge that jurisdiction." *In re Tennant*, 359 F.3d 523, 527 (D.C. Cir. 2004) (quoting *Clinton v. Goldsmith*, 526 U.S. 529, 534-35 (1999)).

In his reply brief, Jarkesy shifted gears to a different All Writs Act argument. Invoking our decision in *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70 (D.C. Cir. 1984), he argues that we should nonetheless pass upon his claims to protect our potential *future* jurisdiction over his petition for review of the Commission's final order (should he lose and choose to seek review with our court). Appellants Reply Br. 4-5; *see Telecomm. Research*, 750 F.2d at 76. There may be other problems with that argument, but we will rest on this one: Jarkesy forfeited the argument by failing to raise it in his opening brief. *See Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 123 (D.C. Cir. 2010).

\*   \*   \*   \*   \*

We hold that the securities laws provide an exclusive avenue for judicial review that Jarkesy may not bypass by filing suit in district court. We therefore affirm the judgment of the district court dismissing the case for lack of subject-matter jurisdiction.

*So ordered*.