Tilton v. SEC

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2015

(Argued: September 16, 2015    Decided: June 1, 2016)

Docket No. 15-2103

———————————

Lynn Tilton, Patriarch Partners, LLC, Patriarch Partners VIII, LLC,
Patriarch Partners XIV, LLC, and Patriarch Partners XV, LLC,
*Plaintiffs-Appellants*,

v.

Securities and Exchange Commission,
*Defendant-Appellee*.

———————————

Before:        NEWMAN, SACK, and DRONEY, *Circuit Judges*.

The appellants, Lynn Tilton and several of her investment firms, are respondents in an ongoing administrative proceeding initiated by the Securities and Exchange Commission and conducted by an administrative law judge. They brought suit in the United States District Court for the Southern District of New York to enjoin the Commission's proceeding before its completion, on the theory that the administrative law judge's appointment violated the Appointments Clause of Article II of the United States Constitution. The district court (Ronnie Abrams, *Judge*) dismissed the suit for lack of subject matter jurisdiction. The

appellants now ask us to overturn that dismissal and reach the merits of their constitutional argument.  We agree with the district court, however, that Congress implicitly precluded federal jurisdiction over the appellants' Appointments Clause claim while the Commission's proceeding remains pending.  The judgment of the district court is therefore

AFFIRMED.

Judge NEWMAN concurs in a separate opinion.

Judge DRONEY dissents in a separate opinion.

DAVID M. ZORNOW, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY (Christopher J. Gunther, *on the brief*), *for Plaintiffs-Appellants.*

Susan E. Brune (*on the brief*), Brune & Richard LLP, New York, NY, *for Plaintiffs-Appellants.*

MARK B. STERN, Appellate Staff Attorney (Mark R. Freeman and Megan Barbero, Appellate Staff Attorneys, *on the brief*), *for* Benjamin C. Mizer, Principal Deputy Assistant Attorney General, and Beth S. Brinkmann, Deputy Assistant Attorney General, United States Department of Justice, Washington, DC, *for Defendant-Appellee.*

Jeannette A. Vargas (*on the brief*), *for* Preet Bharara, United States Attorney for the

Southern District of New York, *for Defendant-Appellee.*

SACK, *Circuit Judge*:

The Securities and Exchange Commission (the "SEC" or the "Commission") enforces the federal securities laws by, among other things, filing actions seeking monetary penalties against alleged transgressors.  Under the 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"), Pub. L. No. 111-203, 124 Stat. 1376, the SEC's enforcement actions generally may take either of two forms: a civil lawsuit in federal district court, or an administrative proceeding conducted by the Commission or an administrative law judge ("ALJ").  Where both of those alternatives are available, the choice between them belongs to the SEC without express statutory constraint.

In this case, the SEC chose to seek penalties against the appellants, Lynn Tilton and several of her investment firms, by commencing an administrative proceeding conducted by an ALJ.  That proceeding is subject to two layers of review:  A party that loses before the ALJ may petition for *de novo* review by the Commission, and a party that loses before the Commission may petition for review by a federal court of appeals.  Not unlike a lawsuit in district court,

3

therefore, the administrative proceeding ultimately offers the losing party a route to federal appellate review.

The appellants contend that the SEC's administrative proceeding is unconstitutional because the presiding ALJ's appointment violated Article II's Appointments Clause. They have raised that claim as an affirmative defense within the proceeding and will be able to argue the issue in a federal court of appeals if they lose before the Commission. The appellants nevertheless sought more immediate access to federal court: Two days after the administrative proceeding against them began, they filed a separate lawsuit in the United States District Court for the Southern District of New York asserting their Appointments Clause claim and seeking an injunction against the ALJ's adjudication based on its alleged unconstitutionality.

The district court (Ronnie Abrams, *Judge*) dismissed the suit for lack of subject matter jurisdiction. Relying in part on the Supreme Court's decisions in *Elgin v. Department of Treasury*, --- U.S. ---, 132 S. Ct. 2126 (2012), *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477 (2010), and *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), the court concluded that the appellants' Appointments Clause challenge fell within the exclusive scope of the

4

SEC's administrative review scheme and could reach a federal court only on petition for review of a final decision by the Commission.

We agree. By enacting the SEC's comprehensive scheme of administrative and judicial review, Congress implicitly precluded federal district court jurisdiction over the appellants' constitutional challenge.

## BACKGROUND

Until 2010, the SEC's authority to impose monetary penalties through administrative proceedings was relatively limited. The agency could not, for example, penalize a non-regulated person such as Tilton through administrative channels. The Dodd-Frank Act dramatically expanded the SEC's authority to impose penalties administratively, making it essentially "coextensive with [the SEC's] authority to seek penalties in Federal court." H.R. Rep. No. 111–687, at 78 (2010). Since then, the SEC has reportedly prosecuted an increasing number of cases through administrative proceedings, with a rate of success notably higher than it has achieved in federal district courts. *See* Jean Eaglesham, *In-House Judges Help SEC Rack Up Wins*, Wall St. J., May 7, 2015, at A1.

When the Commission chooses to seek penalties administratively, it must either preside over the proceeding itself or designate a hearing officer — usually

an ALJ — to do so. *See* 17 C.F.R. § 201.110. A presiding ALJ has authority to issue an initial decision, which may become final only by order of the Commission. *See id.* § 201.360. If a party petitions for review of the ALJ's initial decision, the Commission ordinarily reviews the decision *de novo* before issuing a final order. *See id.* § 201.411. And a final order issued under the securities laws, including the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq.*, is in turn subject to judicial review by a federal court of appeals, *see id.* § 80b–13(a) (providing that "[a]ny person or party aggrieved by an order issued by the Commission under [the Investment Advisers Act] may obtain a review of such order in the United States court of appeals within any circuit wherein such person resides or has his principal office or place of business, or in the United States Court of Appeals for the District of Columbia").

During the past year or so, several respondents in ongoing SEC administrative proceedings have asserted that Article II of the United States Constitution bars the agency's ALJs from acting as hearing officers. These respondents have made two distinct constitutional arguments: that the ALJs are impermissibly insulated from presidential removal, and that they were not

appointed in accordance with the Appointments Clause.[1]  Respondents may raise those arguments as affirmative defenses during the course of their administrative proceedings, subject to potential judicial review in the event of an adverse decision by the Commission.  Seeking more immediate judicial scrutiny, however, some respondents — the appellants among them — attempted to raise their Article II claims in parallel actions brought in federal district courts before their administrative proceedings concluded.  *See Spring Hill Capital Partners, LLC v. SEC*, No. 15-CV-4542 (S.D.N.Y. 2015) (challenging ALJ's appointment); *Hill v. SEC*, No. 1:15-CV-1801 (N.D. Ga. 2015) (challenging ALJ's appointment and insulation from removal); *Duka v. SEC*, No. 15-CV-357 (S.D.N.Y. 2015) (challenging ALJ's appointment and insulation from removal); *Bebo v. SEC*, No. 15-C-3 (E.D. Wis. 2015) (challenging ALJ's insulation from removal).

---

[1] The Appointments Clause reads in pertinent part:

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. Art. II, § 2, cl. 2.

In the case at bar, the SEC initiated an administrative proceeding before an ALJ in March 2015, alleging that the appellants had violated the Investment Advisers Act. Two days later, the appellants filed this lawsuit in the United States District Court for the Southern District of New York. They sought to enjoin the SEC's administrative proceeding on the ground that, among other things, the presiding ALJ's appointment violated the Appointments Clause.[2] The SEC moved to dismiss the suit, arguing in part — as it has in cases brought by similarly situated respondents — that the district court lacked subject matter jurisdiction over the lawsuit. In the Commission's view, the administrative proceeding at issue, once begun, precluded the appellants' collateral Appointments Clause challenge.

While the district court heard argument and deliberated, several other federal judges reached conflicting decisions on the same jurisdictional issue, creating a split both within and outside the Southern District. *Compare Spring Hill*, No. 15-CV-4542 (S.D.N.Y. June 26, 2015) (bench ruling) (Ramos, *J.*) (concluding that the court lacked jurisdiction over a respondent's Article II

---

[2] The appellants also argued before the district court that their presiding ALJ was impermissibly insulated from presidential removal. They have not pressed that argument on appeal, although they purport to have "preserve[d]" it. Appellants' Br. at 31 n.10.

8

challenge to the ALJ conducting an ongoing administrative proceeding), *with Hill v. SEC*, 114 F. Supp. 3d 1297 (N.D. Ga. 2015) (concluding that there was such jurisdiction), *and Duka v. SEC*, 103 F. Supp. 3d 382, 392 (S.D.N.Y. 2015) (same); *see also Bebo v. SEC*, 2015 WL 905349, at *4, 2015 U.S. Dist. LEXIS 25660, at *10 (E.D. Wis. Mar. 3, 2015) (concluding, before the case at bar was filed, that the court lacked jurisdiction over a respondent's Article II challenge to the ALJ conducting an ongoing administrative proceeding), *aff'd*, 799 F.3d 765 (7th Cir. 2015). On June 30, 2015, after weighing the merits of those intervening decisions, the district court decided in favor of the SEC, dismissing the appellants' suit as implicitly precluded by the Commission's statutory scheme of administrative and judicial review. *Tilton v. SEC*, No. 15-CV-2472, 2015 WL 4006165, at *1, 2015 U.S. Dist. LEXIS 85015, at *2-3 (S.D.N.Y. June 30, 2015).

The appellants now ask us to reverse the district court's jurisdictional dismissal of their Appointments Clause claim and rule, on the merits, that the ALJ presiding over their administrative proceeding was unconstitutionally appointed. At the appellants' request, we have stayed the SEC's proceeding pending our decision in this appeal. We review the district court's determination

9

of subject matter jurisdiction *de novo*.  *Scelsa v. City Univ. of N.Y.*, 76 F.3d 37, 40 (2d Cir. 1996).

**DISCUSSION**

The statutes that establish the SEC's scheme of administrative and judicial review, including the Dodd-Frank Act and the Investment Advisers Act, do not expressly preclude federal district court jurisdiction over the appellants' Appointments Clause claim.  The crucial jurisdictional issue in this case, therefore, is whether the statutes do so implicitly.

To resolve that issue, we must first determine whether it is "fairly discernible" from the "text, structure, and purpose" of the securities laws that Congress intended the SEC's scheme of administrative and judicial review "to preclude district court jurisdiction."  *Elgin*, 132 S. Ct. at 2132-33.  That initial inquiry is guided by the proposition that "[g]enerally, when Congress creates procedures designed to permit agency expertise to be brought to bear on particular problems, those procedures are to be exclusive."  *Free Enterprise*, 561 U.S. at 489 (internal quotation marks omitted).

If we conclude that the SEC's scheme precludes district court jurisdiction, we must then decide whether the appellants' Appointments Clause claim is "of

10

the type Congress intended to be reviewed within th[e] statutory structure." *Id.* (alteration in original) (quoting *Thunder Basin*, 510 U.S. at 207). This second inquiry is guided by the Supreme Court's decisions in *Thunder Basin*, *Free Enterprise* and *Elgin*, which instruct us to "presume" that a claim is not confined to administrative channels "if 'a finding of preclusion could foreclose all meaningful judicial review'; if the suit is 'wholly collateral to a statute's review provisions'; and if the claims are 'outside the agency's expertise.'" *Id.* (quoting *Thunder Basin*, 510 U.S. at 212-13). We refer to those considerations as the *Thunder Basin* factors.

Our resolution of these two inquiries — whether Congress intended the SEC's administrative scheme to preclude district court jurisdiction, and whether the scheme encompasses a respondent's Appointments Clause challenge to a presiding ALJ — leads us to conclude that the appellants' lawsuit must be dismissed. Two of our sister circuits recently reached similar conclusions. *See Jarkesy v. SEC*, 803 F.3d 9 (D.C. Cir. 2015); *Bebo v. SEC*, 799 F.3d 765 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 1500 (2016). We agree in large part with their reasoning.

11

**I**

As an initial matter, the text, structure, and purpose of the securities laws make clear that Congress intended the SEC's scheme of administrative review to permit the Commission to bring its expertise to bear in enforcing the securities laws. The scheme enables the SEC's Division of Enforcement to bring statutory charges before an administrative tribunal and affords respondents the opportunity to gather evidence, present a defense, and appeal any adverse rulings in federal court. In *Thunder Basin*, the Supreme Court held that a similar scheme precluded federal district court jurisdiction over challenges to an agency's application of a statute to particular facts. 510 U.S. at 208-09, 216. We reach the same conclusion here. Generally, therefore, persons responding to SEC enforcement actions are precluded from initiating lawsuits in federal courts as a means to defend against them. *See Jarkesy*, 803 F.3d at 16-17 (analogizing the SEC's statutory review scheme to the scheme at issue in *Thunder Basin* and concluding that Congress intended "to preclude suits [in federal courts] by respondents in SEC administrative proceedings in the mine-run of cases").[3]

---

[3] The *Hill* decision concluded that "[t]here can be no 'fairly discernible' Congressional intent to limit jurisdiction away from district courts when the text of the statute" permits the SEC to initiate enforcement actions in either "district court [or]

12

**II**

The appellants do not contest that conclusion. They implicitly acknowledge that an SEC administrative proceeding, once initiated, is the exclusive initial forum for claims "requiring the development of a factual record, the exercise of agency discretion, or the application of a statute to particular facts." Appellants' Br. at 4. They argue, however, that their Appointments Clause challenge is a distinct type of claim: "a threshold constitutional challenge to agency practice." *Id.* at 12. They assert that this type of claim satisfies all three of the *Thunder Basin* factors and so falls outside the exclusive purview of the SEC's administrative review scheme.

The district court held that the appellants' Appointments Clause claim failed to satisfy at least two of the *Thunder Basin* factors: It would be subject to meaningful judicial review within the SEC's administrative scheme, and it was not "wholly collateral" to the scheme. *Tilton*, 2015 WL 4006165, at *4-12, 2015 U.S.

administrative proceedings." *Hill,* 114 F. Supp. 3d at 1306. We disagree. Congress's decision to vest the SEC with a choice between forums does not imply that the chosen forum should not be exclusive of the other. To the contrary — without such exclusivity, the SEC's statutory power to choose would be illusory. *See Jarkesy*, 803 F.3d at 17 ("Congress granted the choice of forum to the Commission, and that authority could be for naught if respondents . . . could countermand the Commission's choice by filing a court action.").

13

Dist. LEXIS 85015, at *9-34.  The district court also suggested, but did not decide, that the Appointments Clause claim failed to satisfy the remaining *Thunder Basin* factor because it did not fall outside the SEC's expertise.  *See id.* at 2015 WL 4006165, at *12-13, 2015 U.S. Dist. LEXIS 85015, at *34-36.  Despite leaving a decision as to that factor open, the court concluded that Congress intended the SEC's administrative review scheme to encompass the appellants' Appointments Clause claim, to the exclusion of federal district court jurisdiction.

We agree with that conclusion.  The appellants' Appointments Clause claim will be subject to meaningful judicial review through administrative channels, a fact that weighs strongly against district court jurisdiction.  *See Bebo*, 799 F.3d at 774-75 (characterizing the availability of meaningful judicial review as the "most important" *Thunder Basin* factor).   And although the other two *Thunder Basin* factors present closer questions in this case, they do not persuasively demonstrate that the Appointments Clause claim falls outside the scope of the SEC's overarching scheme.

    *A.*    *The Availability of Meaningful Judicial Review*

Turning in more detail to the application of the *Thunder Basin* factors, we first consider whether the SEC's administrative scheme assures that the

14

appellants have an opportunity for meaningful judicial review of their Appointments Clause claim. The appellants do not dispute that the scheme offers *some* judicial review: an appeal to a federal circuit court from an adverse ruling by the Commission. They argue, however, that such review would not be "meaningful" because it could not provide an adequate remedy for the SEC's alleged violation of the Appointments Clause. That is so, in the appellants' view, because their exposure to the ongoing proceeding — as distinct from any adverse ruling that might result — would itself constitute a grave constitutional injury that could not be redressed after the fact. As precedential support for their position, the appellants cite the Supreme Court's decision in *Free Enterprise* and our decades-old decision in *Touche Ross & Co. v. SEC*, 609 F.2d 570 (2d Cir. 1979).

The appellants' argument is not without force, as demonstrated by its success in several district courts. *See Hill*, 2015 WL 4307088, at *6-8, 2015 U.S. Dist. LEXIS 74822, at *17-19; *Duka*, 103 F. Supp. 3d 382, 390-91. Ultimately, however, we are not convinced. In our view, the appellants' argument misconstrues both *Free Enterprise* and *Touche Ross* and is at odds with the established approach to analogous jurisdictional disputes in federal courts.

*i.* *Free Enterprise*

*Free Enterprise* dealt with the Public Company Accounting Oversight Board (the "PCAOB"), an entity created under the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745, to supervise the practices of accounting firms. The PCAOB's five members were to be appointed by the SEC, and some — but not all — of the PCAOB's regulatory actions required SEC approval in the form of a final Commission order. The Sarbanes-Oxley Act, like the Investment Advisers Act before it, permitted losing parties to appeal from an adverse final order to a federal court of appeals. The statute made no provision, however, for federal review of Board actions that did not require SEC approval. *See Free Enterprise*, 561 U.S. at 489-90.

In the *Free Enterprise* case, the PCAOB had, in the course of its supervisory work, "inspected [a particular accounting] firm, released a report critical of its auditing procedures, and [begun] a formal investigation." *Id.* at 487. Those actions were not subject to review by the SEC or approval by final Commission order, and so did not give rise to an administrative route to federal review. *Id.* at 489-90. The accounting firm then filed a lawsuit in federal district court that sought to void the PCAOB's actions on Article II grounds. The firm argued, as

16

the appellants do here, that the SEC had violated the Appointments Clause when it selected the members of the PCAOB, rendering their appointments constitutionally infirm. *Id.* at 487-88.

The Supreme Court held that the district court could exercise jurisdiction over the accounting firm's lawsuit, despite the availability of administrative review regarding some other PCAOB actions. *Id.* at 490-91. The Court reasoned, in part, that the administrative review scheme failed to make any form of judicial review meaningfully accessible to the firm. Because the PCAOB's regulatory actions had not produced a reviewable Commission order, the accounting firm could have raised its constitutional objection in federal court through administrative channels only by manufacturing a new, tangential dispute that *would* require a Commission order, and then using that dispute as a vehicle for its Article II claims. The Court deemed that circuitous option inadequate, and so concluded that meaningful judicial review was not otherwise available to the accounting firm. *Id.* at 490.

The appellants read *Free Enterprise* to suggest that judicial review of an Article II challenge to an administrative tribunal is not meaningful if conducted after the tribunal's proceeding concludes, because of the inherent remedial

limitations of post-proceeding review.  *See* Appellants' Br. at 13, 17-18.  We disagree.  The *Free Enterprise* Court's analysis turned on the accessibility of post-proceeding review by a federal court of appeals — not on whether such review, if accessible, could adequately remedy the PCAOB's alleged violation of Article II.  *Free Enterprise* therefore lends no support to the appellants' characterization of their prospective constitutional injury as irremediable after the conclusion of their administrative proceeding.

### ii.   *Touche Ross*

The appellants' reliance on *Touche Ross* is similarly unavailing.  There, the SEC took steps to institute an administrative proceeding against an accounting firm and several of its partners (collectively, "Touche Ross") under Rule 2(e) of the Commission's Rules of Practice, which related to the suspension and disbarment of persons practicing before the Commissioner.  Touche Ross immediately filed a lawsuit in federal court seeking to enjoin the proceeding on the ground that Rule 2(e) was not authorized by statute.

The district court declined to exercise jurisdiction.  It reasoned, in part, that the planned administrative proceeding would not irreparably harm Touche Ross, which meant that Touche Ross was required to exhaust the administrative

18

review process before raising its claims in federal court. *See Touche, Ross & Co. v. SEC*, No. 76-CV-4489, 1978 WL 1084, at \*4-5, 7-9, 1978 U.S. Dist. LEXIS 17974, \*9-12, 18-19, 23 (S.D.N.Y. Apr. 24, 1978), *aff'd sub nom. Touche Ross & Co. v. SEC*, 609 F.2d 570 (2d Cir. 1979).

On appeal, this Court recognized district court jurisdiction over Touche Ross's lawsuit. The panel acknowledged that federal challenges to administrative proceedings at "intermediate stages" are generally disfavored, particularly where — as in the case before it — the agency had not acted "plainly beyond its jurisdiction." *Touche Ross*, 609 F.2d at 576. Nonetheless, the Court permitted Touche Ross's lawsuit to proceed on the ground that its constitutional claim would not benefit from the SEC's "expertise," "discretion" or factfinding, and was thus already ripe for federal adjudication. *Id.* at 577.

The Court's decision did not suggest that a federal court would be unable to vindicate Touche Ross's challenge to Rule 2(e) after the SEC's proceeding concluded.[4] It held only that there was no compelling reason for Touche Ross to wait for post-proceeding review because the administrative tribunal would not

---

[4] Indeed, in a concurring opinion, two members of the panel expressed their confidence in the capacity of post-proceeding judicial review to "correct the occasional excesses and errors that are an inevitable part of the administrative process." *Touche Ross*, 609 F.2d at 583 (Kaufman, C.J., concurring).

bring its expertise to bear in a way that would aid a federal court's eventual adjudication. That proposition does not support the appellants' contention here that post-proceeding judicial review of their Appointments Clause challenge will not be meaningful. Rather, *Touche Ross* resonates with a different *Thunder Basin* factor: whether a claim falls outside an agency's expertise. And its reasoning on that issue is no longer considered sound, as we explain below.

          iii.     Conflict with Established Practice Regarding Analogous Challenges to a Tribunal's Constitutional Legitimacy

The appellants' argument that post-proceeding judicial review of their Appointments Clause claim will be meaningless is not merely unsupported by *Free Enterprise* and *Touche Ross*; it is also at odds with established practice in federal court regarding analogous challenges to a tribunal's constitutional legitimacy. As the district court explained, litigants who unsuccessfully challenge the authority of a presiding judge or jury to decide a case often must wait to appeal the issue until after the court renders a final judgment. *See, e.g.*, *Germain v. Connecticut Nat'l Bank*, 930 F.2d 1038, 1040 (2d Cir. 1991) (concluding that a defendant who unsuccessfully challenged the plaintiff's right to jury trial must await the jury's verdict before appealing); *D'Ippolito v. Am. Oil Co.*, 401 F.2d 764, 764-65 (2d Cir. 1968) (per curiam) (deciding that a defendant who

unsuccessfully challenged the transfer of his case to another district must await the other district court's "final judgment" before appealing); *see also In re al-Nashiri*, 791 F.3d 71, 75, 80 (D.C. Cir. 2015) (concluding, in denying a petition for writ of mandamus, that a defendant who unsuccessfully raised an Appointments Clause challenge to two of the United States Court of Military Commission Review's presiding judges must await the judges' ruling before appealing in federal court).  Like the appellants here, a litigant in this kind of case must expend financial and emotional resources to complete a proceeding that may ultimately prove constitutionally infirm.[5]  Subsequent judicial review cannot restore those resources, but it can vacate the resulting judgment and remand for a new proceeding.  That post-proceeding relief, although imperfect, suffices to vindicate the litigant's constitutional claim.  *See Germain*, 930 F.2d at 1040 (explaining that if a jury trial were in fact improper, an appellate court could "remand for a nonjury trial, thus vindicating the [objecting defendant's] right"); *see also In re al-Nashiri*, 791 F.3d at 80 ("Vacatur [premised on the defendant's Appointment Clause claim], even at the appeal-from-final-judgment stage,

---

[5]  *Cf.* Learned Hand, *The Deficiencies of Trials To Reach the Heart of the Matter*, 3 Association of the Bar of the City of New York, Lectures on Legal Topics 89, 105 (1926) (musing that becoming a party to a lawsuit should be "dread[ed] . . . beyond almost anything else short of sickness and death").

21

would fully vindicate [the defendant's] rights and the President's and the Senate's constitutional powers." (internal quotation marks and alterations omitted)).  The litigant's financial and emotional costs in litigating the initial proceeding are simply the price of participating in the American legal system, and not an irreparable injury that necessitates interlocutory review of the initial court's jurisdiction.

The Supreme Court applied this principle to facts similar to those presented to us here in *FTC v. Standard Oil Co. of California*, 449 U.S. 232 (1980). There, an oil company brought suit in federal district court to enjoin an ongoing administrative proceeding conducted by the Federal Trade Commission ("FTC"), contending that the proceeding as a whole was unlawful because the FTC had initiated it without the requisite evidentiary basis. *Id.* at 235.  As a general matter, a respondent in this type of proceeding must exhaust its administrative remedies before filing a related action in federal court, unless the respondent would suffer irreparable injury from the delay.  *See Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974).  The oil company argued that it had exhausted all relevant remedies before filing its federal lawsuit.  *Standard Oil*, 449 U.S. at 243.  In the alternative, however, the company contended that any failure

to exhaust should be excused because the company would suffer irreparable injury in the form of "expense and disruption" if it were compelled to complete the administrative proceeding before reaching federal court. *Id.* at 244. That argument closely resembles the appellants' claim here that post-proceeding judicial review will be powerless to remedy the injury they will suffer by enduring the SEC's administrative adjudication.

The Supreme Court concluded that a federal court would be able to meaningfully review the oil company's claim after the administrative proceeding ended, and therefore ordered the company's lawsuit dismissed on jurisdictional grounds. The Court acknowledged that the company would endure "substantial" expense and disruption before the administrative proceeding concluded. *Id.* But it deemed that hardship to be "part of the social burden of living under government," rather than a form of irreparable injury justifying immediate judicial review. *Id.* at 244-45. As the D.C. Circuit subsequently explained, where "the 'injury' inflicted on the party seeking review is the burden of going through an agency proceeding," the Supreme Court's decision in *Standard Oil* "teaches that the party must patiently await the denouement of

proceedings within the Article II branch." *USAA Fed. Sav. Bank v. McLaughlin*, 849 F.2d 1505, 1510 (D.C. Cir. 1988).

In other decisions, the Supreme Court has concluded that post-proceeding judicial review would not be meaningful because the proceeding itself posed a risk of some additional and irremediable harm beyond the burdens associated with the dispute resolution process. *See, e.g.*, *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 496-97, 499 (1991) (permitting a class of undocumented aliens to raise a due-process challenge to INS proceedings in district court, rather than pursue eventual review in a federal court of appeals through administrative channels, partly because most of the aliens could "ensure themselves review in courts of appeals only if they voluntarily surrender[ed] themselves for deportation," a "price . . . tantamount to a complete denial of judicial review for most undocumented aliens"). But the appellants have identified no such additional, irremediable harm here. The only prospective injury that they describe is "being subjected to an unconstitutional adjudicative procedure," with the attendant "embarrassment, expense, . . . ordeal . . . [and] state of anxiety and insecurity." Appellants' Br. at 19, 21 (alterations in original and internal quotation marks omitted). As *Standard Oil* and other decisions discussed above

24

indicate, the prospect of such harm alone does not render post-proceeding judicial review less than meaningful. *Cf. In re al-Nashiri*, 791 F.3d at 79-80 (explaining that the defendant's "abstract concern" that his presiding judges violated "the separation of powers" because they had been improperly appointed did not establish a prospective irreparable injury that justified immediate federal intervention in ongoing administrative proceedings).

We therefore conclude that the appellants will have access to meaningful judicial review of their Appointments Clause claim through administrative channels. *See Bebo*, 799 F.3d at 774 (concluding that a respondent in an ongoing SEC administrative proceeding could obtain meaningful judicial review "[a]fter the pending enforcement action has run its course" by "rais[ing] her objections," including an Article II challenge to the presiding ALJ, "in a circuit court of appeals established under Article III"); *see also Jarkesy*, 803 F.3d at 27 ("Even assuming [the respondent] is right that Congress has unconstitutionally delegated power to the SEC to decide whether to place him in an administrative proceeding rather than in a court action, [the respondent] has no inherent right to avoid an administrative proceeding at all. Thus, his rights can be vindicated by a

reversal of the Commission's final order if the court of appeals grants his petition for review." (internal quotation marks omitted)).

   B.   *Wholly Collateral*

We next consider whether the appellants' Appointments Clause claim is "wholly collateral" to the SEC's administrative scheme. The Supreme Court has not explained precisely how to make this determination, although *Elgin* suggests that a claim is not wholly collateral if it serves as the "vehicle by which" a party seeks to prevail in an administrative proceeding. *See* 132 S. Ct. at 2139-40. In the absence of more extensive guidance, lower courts have adopted two competing approaches. Some decisions have suggested that a claim is *not* wholly collateral to an administrative proceeding only if it is substantively intertwined with the merits dispute that the proceeding was commenced to resolve. *See Hill*, 114 F. Supp. 3d at 1309 (concluding that the respondent's Article II challenge was "wholly collateral" to the ongoing administrative proceeding because "[w]hat occurs at the . . . proceeding and the SEC's conduct there is irrelevant to" the constitutional challenge); *Duka*, 103 F. Supp. 3d at 391 (concluding that the respondent's Article II challenge was "wholly collateral" to the ongoing administrative proceeding because the challenge did not "attack any order that

26

may be issued . . . relating to the outcome of the SEC action" (internal quotation marks omitted)). Other decisions have suggested that a claim is not wholly collateral if it has been raised in response to, and so is procedurally intertwined with, an administrative proceeding — regardless of the claim's substantive connection to the initial merits dispute in the proceeding. *See Jarkesy*, 803 F.3d at 23 (concluding that claims arising "from actions the Commission took in the course of [its administrative] scheme" were not "wholly collateral"); *Bebo*, 2015 WL 905349, at *2-4, 2015 U.S. Dist. LEXIS 25660, at *4-10 (implicitly concluding that the respondent's Article II challenge did not qualify as wholly collateral to the ongoing administrative proceeding because it was raised there as an affirmative defense). *See generally Bebo*, 799 F.3d at 773-74 (comparing these two lines of decisions).

The district court here adopted the latter approach. It began its analysis by noting that the appellants' Appointments Clause claim is substantively "unrelated to the securities violations underlying the administrative proceeding," such that resolving the challenge "cannot reasonably be characterized as the 'regular' or 'routine' business of SEC administrative proceedings." *Tilton*, 2015 WL 4006165, at *11, 2015 U.S. Dist. LEXIS 85015, at *31-32 (quoting, with minor

27

alterations, *Elgin*, 132 S. Ct. at 2140).  Nevertheless, the court decided that the claim did not qualify as "wholly collateral" because it was procedurally intertwined with the SEC's ongoing proceeding, where it functioned as an affirmative defense. *Id.* at 2015 WL 4006165, at *12, 2015 U.S. Dist. LEXIS 85015, at *32-34.

Absent further guidance from the Supreme Court, we are inclined to agree with the district court's assessment.  The SEC chose to enforce the Investment Advisers Act against the appellants by initiating an administrative proceeding and appointing an ALJ to act as the hearing officer.  The appellants' Appointments Clause claim arose directly from that enforcement action and serves as an affirmative defense within the proceeding.  To be sure, the claim could be narrowly categorized as collateral to the statutory merits of the Investment Advisers Act charges against the appellants.  But we cannot conclude that the claim is *wholly* collateral to the SEC's administrative scheme more broadly.  As the district court recognized, it is "difficult to see how [the Appointments Clause claim] can still be considered 'collateral to any Commission orders or rules from which review might be sought,' since the ALJ and the Commission will, one way or another, rule on those claims and it will be

the Commission's order that [the appellants] will appeal." *Tilton,* 2015 WL 4006165, at \*12, 2015 U.S. Dist. LEXIS 85015, at \*32 (citation and some internal quotation marks omitted) (quoting *Free Enterprise,* 561 U.S. at 490); *see also Jarkesy,* 803 F.3d at 23 (reaching a similar conclusion).  Put another way, the Appointments Clause claim, like accompanying defenses to the merits of the Investment Advisers Act charges, is a "vehicle by which" the appellants seek to prevail in the proceeding.  *Elgin,* 132 S. Ct. at 2139.  The claim identifies a purported error in the way the Commission has sought to enforce the securities laws, albeit one that sounds in administrative procedure rather than statutory construction.

The dissent argues that the appellants' Appointments Clause claim is as collateral to the SEC's administrative scheme as the accounting firm's Appointments Clause claim was in *Free Enterprise*.  *See ante* at 16-17.  We are not persuaded by the analogy.  The Supreme Court's jurisdictional conclusion in *Free Enterprise* was, in our view, shaped principally by the absence of the type of procedural link between constitutional claim and administrative proceeding that exists here.  The accounting firm objected to actions that the PCAOB had taken entirely outside the scope of the SEC's scheme of administrative and judicial

29

review — actions that could not be the subject of "any Commission orders . . . from which review might be sought." *Free Enterprise*, 561 U.S. at 490. The firm filed suit in federal district court, and the Supreme Court allowed the suit to proceed, because the Appointments Clause claim was not moored to any proceeding that would provide for an administrative adjudication and subsequent judicial review.[6] Here, by contrast, the appellants' Appointments Clause claim targets an aspect of an ongoing administrative proceeding. We think that distinction significantly alters the "wholly collateral" analysis, such that the second *Thunder Basin* factor does not favor district court jurisdiction in this case. *See Jarkesy*, 803 F.3d at 23 (noting that a constitutional challenge might qualify as collateral if it "were filed in court before the initiation of any administrative proceeding," as in *Free Enterprise*, but concluding that

---

[6] In explaining why the accounting firm's Appointments Clause claim qualified as wholly collateral, the *Free Enterprise* decision at one point characterized the claim as an "object[ion] to the [PCAOB's] existence." 561 U.S. at 490. Like the D.C. Circuit, we do not read that language "to define a new category of collateral claims that fall outside an otherwise exclusive administrative scheme." *Jarkesy*, 803 F.3d at 24. In our view, the Supreme Court classified the accounting firm's claim as wholly collateral because the PCAOB's disputed actions could not be reviewed by the Commission, which meant that the firm's Appointments Clause challenge to those actions fell entirely outside the scope of the administrative scheme and could not be resolved by a Commission "order[] . . . from which [judicial] review might be sought." *Free Enterprise*, 561 U.S. at 490.

30

constitutional challenges were not collateral when raised in response to "multiple aspects of [an] ongoing proceeding").

C.    *Agency Expertise*

The final consideration within the *Thunder Basin* framework is whether the appellants' Appointments Clause claim falls outside the SEC's expertise. This is a close question. As an initial matter, the Supreme Court's decision in *Free Enterprise* suggests that the SEC does not possess unique legal expertise in analyzing the constitutional sufficiency of its appointments. There, the Court concluded that the merits of an Appointments Clause challenge to the PCAOB fell "outside the Commission's competence and expertise" because the claim raised only "standard questions of administrative law," which were unrelated to any "statutory" or "fact-bound inquiries" that the SEC might be singularly qualified to perform. 561 U.S. at 491.

Under *Touche Ross*, that conclusion might end our analysis of agency expertise. As noted, the panel there permitted respondents to challenge an ongoing SEC administrative proceeding in federal district court solely because the legal substance of the challenge fell outside the administrative tribunal's expertise and could not be usefully developed through its factfinding. 609 F.2d

31

at 577. But the Supreme Court has since adopted a broader conception of agency expertise in the jurisdictional context. *Elgin*, in particular, emphasizes that an agency may bring its expertise to bear on a constitutional claim indirectly, by resolving accompanying, potentially dispositive issues in the same proceeding. *See Jarkesy*, 803 F.3d at 28-29 (noting that "*Elgin* . . . clarified . . . that an agency's relative[ly low] level of insight into the *merits* of a constitutional question is not determinative" of whether the agency can bring its expertise to bear).

In *Elgin*, federal employees who allegedly had been discharged for violating a statutory command sought reinstatement by challenging the constitutionality of the statute. Congress had previously created an administrative process to adjudicate specified personnel decisions regarding federal employees, which was conducted initially by the Merit Systems Protection Board ("MSPB") and subject to review in the Federal Circuit. Before completing that administrative process, the employees attempted to raise their constitutional challenge to the statute in federal district court. In an effort to establish federal jurisdiction, they contended that the claim fell outside the MSPB's expertise because the MSPB disclaimed authority to determine the constitutionality of a federal statute. *Elgin*, 132 S. Ct. at 2130-31, 2140.

32

The Supreme Court disagreed.  Although the MSPB had indeed disclaimed authority to resolve constitutional challenges to statutes, the Court identified several ways in which the agency might "otherwise" bring its expertise "to bear" in proceedings that raised those challenges.  First, the MSPB could resolve "preliminary questions unique to the employment context" that might "obviate the need to address the constitutional challenge." *Id.* at 2140.  Second, "the challenged statute [could] be one that the MSPB regularly construes, and its statutory interpretation could alleviate constitutional concerns." *Id.*  And third, "an employee's appeal [could] involve other statutory or constitutional claims that the MSPB routinely considers, in addition to a constitutional challenge to a federal statute," whose resolution "in the employee's favor might fully dispose of the case." *Id.*  In light of those potential applications of agency expertise to other dimensions of the administrative proceeding, the Court concluded that there was "no reason to conclude that Congress intended to exempt" the employees' constitutional challenge "from exclusive review before the MSPB and the Federal Circuit." *Id.*

Applying *Elgin*'s approach here, we think that the SEC might bring its expertise to bear on the appellants' proceeding by resolving accompanying

33

statutory claims that it "routinely considers," and which "might fully dispose of the case" in the appellants' favor.  132 S. Ct. at 2140.  In particular, the Commission could rule that the appellants did not violate the Investment Advisers Act, in which case the constitutional question would become moot.

It may be argued that the application of agency expertise to the statutory issues in the appellants' proceeding would improperly skip over their Appointments Clause claim, which raises a "threshold" issue that logically precedes a merits adjudication.  Although we are mindful of that concern, the Supreme Court appears to have rejected an analogous argument in *Standard Oil*. There, the respondent oil company, like the appellants here, sought to raise a "threshold" challenge to its administrative proceeding as a whole soon after the proceeding began.  The Ninth Circuit permitted the district court to exercise jurisdiction over that challenge, in part because it feared that the oil company's victory on other grounds in the administrative proceeding would evade, and improperly "moot," the threshold issue.  *Standard Oil Co. of Cal. v. FTC*, 596 F.2d 1381, 1387 (9th Cir. 1979), *rev'd*, 449 U.S. 232 (1980).  The Supreme Court expressly rejected that rationale and reversed, explaining:

> [O]ne of the principal reasons to await the termination of agency proceedings is to obviate all occasion for judicial review.  Thus, the

possibility that [the oil company's] challenge may be mooted in adjudication warrants the requirement that [the company] pursue adjudication, not shortcut it.

*Standard Oil*, 449 U.S. at 244 n.11 (internal quotation marks and citations omitted). In light of that passage, we are inclined to read *Elgin*'s mention of "other statutory or constitutional claims" that might "fully dispose of the case," 132 S. Ct. at 2140, to include the Investment Advisers Act charges here.

Such a reading of *Elgin* dovetails with our analysis of the availability of meaningful judicial review. We have already concluded, in keeping with established federal practice regarding analogous disputes, that the appellants may adequately vindicate their Appointments Clause claim by first awaiting a final Commission order and then petitioning for judicial review on constitutional grounds only if the order is adverse. By the same logic, a favorable Commission order, including one on statutory grounds, would provide an acceptable resolution of the Appointments Clause claim and obviate any need for judicial review. It follows, we think, that the Commission may bring its expertise to bear in a manner potentially relevant to the constitutional issue by resolving the statutory charges against the appellants. For that reason, the final *Thunder Basin* factor lends minimal support to the appellants' jurisdictional argument. *See*

35

*Jarkesy*, 803 F.3d at 29 (concluding that "the Commission's expertise can otherwise be brought to bear on the issues in [the respondent's] proceeding" because "the agency could moot the need to resolve" the respondent's constitutional claims, including several threshold challenges to the proceeding as a whole, "by finding that he did not commit the securities-law violations of which he stands accused" (internal quotation marks omitted)); *Bebo*, 799 F.3d at 773 ("*Elgin* explained that the possibility that [the respondent] might prevail in the administrative proceeding (and thereby avoid the need to raise her constitutional claims in an Article III court) does not render the statutory review scheme inadequate.").

**CONCLUSION**

After considering each of the *Thunder Basin* factors, we conclude that Congress intended the appellants' Appointments Clause claim "to be reviewed within" the SEC's exclusive "statutory structure." *Free Enterprise*, 561 U.S. at 489 (quoting *Thunder Basin*, 510 U.S. at 207). The "threshold" nature of the claim does not defeat the presumption that it, like other procedural and substantive defenses to an enforcement action, must be resolved in the first instance through agency proceedings. To the contrary: "Many respondents in SEC proceedings join substantive defenses to their securities charges together with challenges to

36

the Commission's actions or authority. It makes good sense to consolidate all of each respondent's issues before one court for review, and only after an adverse Commission order makes that review necessary." *Jarkesy*, 803 F.3d at 29-30. We therefore conclude, in keeping with the decisions of the Seventh and D.C. Circuits in *Bebo* and *Jarkesy*, that the appellants must await a final Commission order before raising their Appointments Clause claim in federal court. The judgment of the district court is AFFIRMED, and our stay on further proceedings by the SEC is VACATED.

*Tilton v. Securities and Exchange Commission*
Docket No. 15-2103

Jon O. Newman, *Circuit Judge*, concurring:

An additional reason why the Appellants in this case must raise their Appointments Clause issue by filing a petition for review in a court of appeals rather than initiate a new action in a district court is a concept that has been called "colorable jurisdiction." As the Seventh Circuit has explained in a case challenging an order of criminal contempt, "If a court has colorable jurisdiction of a case, though later it is determined that actually it didn't have jurisdiction, an order of criminal contempt issued by the court before the absence of jurisdiction is determined is valid." *Mann v. Calumet City*, 588 F.3d 949, 954 (7th Cir. 2009).

The Supreme Court, without using the phrase "colorable jurisdiction," made the same point in *United States v. United Mine Workers of America*, 330 U.S. 258 (1947). The Court there ruled that even if the constitutionality of a statute is in doubt, an order issued by a court under that statute must be obeyed and enforced even by criminal contempt. *See id*. at 293. The Court noted that "a different result would follow were the question of jurisdiction frivolous and not substantial," *id.*, or, as Justice Frankfurter's concurrence put it, the "court is

1

so obviously traveling outside its orbit as to be merely usurping judicial forms and facilities," *id.* at 309 (Frankfurter, J., concurring).

The concept of colorable jurisdiction has also been deemed relevant to the availability of a collateral attack to challenge a judgment for lack of subject matter jurisdiction. Courts have distinguished between an erroneous assertion of subject matter jurisdiction, where collateral attack is precluded by *res judicata*, and a clear usurpation of judicial power, where collateral attack is permitted. *See Nemaizer v. Baker*, 793 F.2d 58, 65 (2d Cir. 1986) (collecting cases); *see also* Restatement (Second) of Judgments § 12(1) (1982). "Collateral attack is available only if the assertion of subject matter jurisdiction was without colorable basis, not merely erroneous." *In re U.S. Catholic Conference*, 824 F.2d 156, 165 (2d Cir. 1987), *rev'd on other grounds*, *U.S. Catholic Conference v. Abortion Rights Mobilization, Inc.*, 487 U.S. 72 (1988) (on direct appeal, nonparty witness held in civil contempt may challenge subject matter jurisdiction of court in underlying action).

The Administrative Law Judge ("ALJ") that will be hearing the pending administrative proceeding against the Appellants is not an interloper. The ALJ is an official of the agency,

2

facially clothed with authority to adjudicate the proceeding before her. Whether her appointment comports with the Appointments Clause is a fair question, but there is surely a plausible basis for arguing that her appointment is valid.

With colorable jurisdiction, the ALJ may adjudicate the administrative case, and the losing party will have its opportunity to seek review before the Commission and then petition for review of a final order in a Court of Appeals, *see* 15 U.S.C. § 80b-13(a).

For this additional reason, I concur in Judge Sack's opinion for the Court.

DRONEY, *Circuit Judge*, dissenting:

This case is nearly indistinguishable from *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477 (2010). It differs in only one significant way: administrative proceedings have begun against the appellants. The majority concludes that this distinction alone warrants a different outcome, finding that the fact of the ongoing proceedings means that the three factors identified by the Supreme Court in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994) for determining whether Congress intended to limit jurisdiction of the district courts are satisfied. Consequently, the majority holds that there was no subject matter jurisdiction before the district court.

I respectfully dissent. The majority's application of the *Thunder Basin* factors has stripped the "wholly collateral" and "outside the agency's expertise" factors of any significance: in its view, as long as administrative proceedings have been initiated, those two factors are always satisfied. The majority bases its

understanding of this substantive-to-procedural switch in those two factors on their application by the Supreme Court in *Elgin v. Department of Treasury*, 132 S. Ct. 2126 (2012), but the nature of the constitutional claim presented in *Elgin* was entirely different. I disagree with the majority's interpretation of *Elgin* and conclude that those two *Thunder Basin* factors must be analyzed substantively to determine their weight in each particular case.

I conclude that *Free Enterprise* controls here. In my view, those two factors here have precisely the same weight as they did in *Free Enterprise*, and the application of the remaining factor does not change the result. Thus, I would find that the district court had subject matter jurisdiction to consider the constitutional challenge.

**I.     The *Thunder Basin* Factors**

The Supreme Court in *Thunder Basin* identified the following three factors as helpful in determining whether a statute which provides for administrative review of agency action was intended by

Congress to preclude district court jurisdiction over claims before a final administrative determination: whether the claims are "wholly collateral to a statute's review provisions," whether they are "outside the agency's expertise," and whether "a finding of preclusion could foreclose all meaningful judicial review." *Id.* at 212–13 (internal quotation marks omitted). The Court referred to each as helping determine whether it is "fairly discernible" from a "statutory scheme" that Congress "has allocated initial review to an administrative body." *Id*. at 207, 212–13.[1]

I disagree somewhat with the majority's interpretation of the third factor, "meaningful judicial review," but it is the majority's

---

[1] The majority describes the *Thunder Basin* factors as coming into play only in the second part of a two-part test, seemingly splitting the analysis between asking (1) whether Congress intended to preclude district court jurisdiction and (2) whether Congress intended for the claims at issue to be reviewed within the statutory structure. Majority Op. at 10–11. I disagree with this dichotomy and the conclusion that the factors are relevant only to the second inquiry. *See, e.g., Elgin*, 132 S. Ct. at 2136 (referring to *Thunder Basin* factors as relevant to the single argument characterized variously as: "Congress does not intend to limit district court jurisdiction" (alterations omitted) and "[Petitioners'] claims are not the type that Congress intended to be reviewed within the [administrative] scheme"). However, the majority opinion does not return to this schema and thereafter focuses on the *Thunder Basin* factors as answering the ultimate question of whether the appellants are precluded from bringing their constitutional claims in the district court.

application of the two other factors—"wholly collateral" and "outside the agency's expertise"—with which I most disagree.

There are three cases in which the Supreme Court has reviewed the application of these three factors: *Thunder Basin*, *Free Enterprise*, and *Elgin*. In each, the Supreme Court's analysis of the "wholly collateral" and "outside the agency's expertise" factors has focused on the substance of the claims.

In *Thunder Basin*, a non-union mine owner filed an action in district court challenging its employees' designation of certain union representatives to be involved in safety inspections under the Federal Mine Safety and Health Amendments Act ("Mine Act"). The Mine Act provided for administrative hearings and decisions concerning safety issues, and ultimate appeal to the Courts of Appeals. Respondents contended that this "comprehensive review process," *id.* at 208, in the Mine Act indicated that Congress intended that the safety claim be exclusively reviewed in the

4

"statutory structure," *id*. at 212, and that there was no subject matter jurisdiction for the mine owner's suit in the district court.

In its analysis of whether the mine owner's claims must first be brought in an administrative proceeding, the Supreme Court analyzed the "wholly collateral" and "outside the agency's expertise" factors only by considering the substance of the claims with no mention of the procedural aspects of the case. *Id*. at 213–14 (noting that "Petitioner's statutory claims at root require interpretation of the parties' rights and duties under [the Mine Act and accompanying regulations], and as such arise under the Mine Act and fall squarely within the Commission's expertise" and that the agency has "extensive experience interpreting the walk-around rights" that were at issue).

The Supreme Court engaged in the same sort of substantive analysis in *Free Enterprise*. In *Free Enterprise*, an accounting firm filed an action in the district court which challenged a report issued by

the newly created Public Company Accounting Oversight Board ("PCAOB"). The PCAOB was created as an accounting reform in the Sarbanes-Oxley Act of 2002 and its members were appointed by the SEC. The report had criticized the firm's accounting procedures, but no sanctions were imposed. Thus, the accounting firm could not utilize the statutory administrative review proceedings available before the SEC. The action in the district court by the accounting firm challenged the appointments of the PCAOB members by the SEC, claiming that they violated the Appointments Clause of the Constitution and the members had no authority to issue the negative report. The PCAOB sought to dismiss the action on the basis that the district court had no subject matter jurisdiction to consider the accounting firm's claim.

In its analysis of the "wholly collateral" and "outside the agency's review" factors, the *Free Enterprise* Court examined the substance of the constitutional claim as it related to agency expertise,

561 U.S. at 491 ("[T]he statutory questions involved do not require technical considerations of agency policy." (quotation marks and alterations omitted)), and explained the "wholly collateral" factor in terms of the substantive content of the challenge, *id*. at 490. ("[P]etitioners object to the Board's existence, not to any of its auditing standards. Petitioners' general challenge to the Board is collateral to any Commission orders or rules from which review might be sought."). It made no reference to the procedural aspects of the claim.

**II.     *Elgin v. Department of Treasury***

The third case in which the Supreme Court addressed the *Thunder Basin* factors was *Elgin v. Department of Treasury*, 132 S. Ct. 2126 (2012). The majority concludes that the *Elgin* Court considerably altered the "wholly collateral" and "outside the agency's expertise" factors, but I disagree. I believe the outcome in

*Elgin* was not produced by varying those factors, but by the different type of constitutional claim presented.

In *Elgin*, the plaintiffs challenged their dismissal from federal employment for failure to comply with the Military Selective Service Act by not registering for the draft. Although the plaintiffs had available to them the right to challenge their dismissals through administrative hearings before the Merit Systems Protection Board ("MSPB") and subsequent judicial review in the Federal Circuit, they instead brought suit in federal district court.[2] Their constitutional arguments were that the Selective Service Act discriminates on the basis of sex by requiring only males to register and is a bill of attainder. *Id.* at 2131. Notably, the plaintiffs made no challenge to the available administrative process; they argued only that the *substance* of the laws being enforced against them—laws routinely administered by the MSPB—was unconstitutional. Unsurprisingly,

---

[2] One of the plaintiffs did pursue remedies through the MSPB, but declined to appeal the decision he received within the administrative system, instead joining the others in their suit in district court. *Elgin*, 132 S. Ct. at 2131.

then, the Supreme Court's analysis of the "wholly collateral" and "outside of the agency's expertise" factors, and its conclusion that those two factors in *Elgin* weighed in favor of dismissal of the district court action, was necessarily quite different from that in *Free Enterprise*.

The Supreme Court's application of the "wholly collateral" factor rejected the plaintiffs' argument that their constitutional claims had "nothing to do" with the "day-to-day personnel actions adjudicated by the MSPB." *Id.* at 2139. The Supreme Court pointed out that a challenge to dismissal from employment based on federal statutes is "precisely the type of personnel action regularly adjudicated by the MSPB and the Federal Circuit within the [Civil Service Reform Act ("CSRA")] scheme." *Id*. at 2140. Whether or not that particular challenge involved a constitutional question, it was— in the words of the Supreme Court—"a challenge to CSRA-covered

employment action brought by CSRA-covered employees requesting relief that the CSRA routinely affords." *Id*.

The majority here concludes that *Elgin* held that "a claim is not wholly collateral if it has been raised in response to, and so is procedurally intertwined with, an administrative proceeding," Majority Op. at 27, pointing to the Supreme Court's statement that the constitutional claims in *Elgin* were "the vehicle by which [the petitioners] s[ought] to reverse the removal decisions" made against them, *id*. at 2139. However, that overstates what the Supreme Court did in its application of that factor. That portion of the opinion meant nothing more than that the plaintiffs were challenging actions against them under the statutes committed to the MSPB by attacking the constitutionality of those very statutes—it does not suggest that *no challenge* that would end ongoing proceedings could be considered collateral to a statute's review provisions. Such an interpretation would swallow the rule, for there would no longer be

any need to evaluate the substance of a claim as long as the claim could somehow serve to end administrative proceedings in a plaintiff's favor. This is inconsistent with *Thunder Basin* and *Free Enterprise* (and, in fact, with *Elgin*, which looked carefully at the substance of the challenge). It would also turn the factor into an easy, binary question: Is a proceeding ongoing? If yes, then no claim that would end the proceeding can be wholly collateral. This cannot be what the *Elgin* Court intended. In my view, it held only that a claim involving the substance of the very act entrusted to the agency for implementation and requesting the types of relief that the agency regularly gives—a far cry from the present case, where the constitutional claim has no relation to the securities laws entrusted to the SEC and the requested remedy of disallowing the proceedings before the ALJ is obviously not a routine outcome—cannot be considered "wholly collateral" to the administrative scheme.

As for the "outside the agency's expertise" factor, the *Elgin* Court made clear that this factor would weigh against jurisdiction in cases where a claim needing agency expertise was a "threshold" or "preliminary question" that would "obviate the need to address the constitutional challenge." *Id*. at 2140. This described the situation in *Elgin*, where before deciding that the Selective Service Act was unconstitutional the MSPB had to decide "threshold questions" to which the MSPB could apply its expertise, such as whether constructive discharge occurred as well as whether additional claimed violations of employment statutes took place, which "might fully dispose of the case." *Id*. Those decisions could be informed by its agency expertise in the area of employment law. *Id*. In such a context, the MSPB's expertise could properly be "brought to bear" on the constitutional claim. *Id*. (quoting *Thunder Basin*, 510 U.S. at 214–15). The majority here acknowledges that an issue of federal jurisdiction or the appropriate composition of an adjudicatory

12

body—such as the Appointments Clause challenge presented in this case—logically precedes a merits adjudication; therefore, there is no "threshold" or "preliminary" question that would "obviate the need to address the constitutional challenge."

The majority nonetheless concludes that the *Elgin* Court interpreted this factor to mean that "an agency may bring its expertise to bear on a constitutional claim indirectly, by resolving accompanying, potentially dispositive issues in the same proceeding." Majority Op. at 32. It does so by citing the *Elgin* Court's reference to a situation in which an appeal involves "other statutory or constitutional claims that the MSPB routinely considers, in addition to a constitutional challenge to a federal statute." *Elgin*, 132 S. Ct. at 2140. The majority thus concludes that an issue to which an agency may apply its expertise need only be dispositive, not necessarily "preliminary," for it to weigh against jurisdiction. Majority Op. at 33-34.

That interpretation does not comport with the language of *Elgin*, however, which explicitly set that description out as an *example* of a situation in which there might be "threshold questions" that would allow the initial agency reviewing the case to *not reach* the constitutional question.[3]  Nor would such an expansive interpretation be consistent with the facts underlying and the setting of *Elgin*, where the potentially dispositive issue was clearly a "preliminary" or "threshold question."

To read *Elgin* as broadly as the majority does would mean that as long as a proceeding is ongoing, the "outside the agency's expertise" factor *must* weigh against jurisdiction—because any time a proceeding has commenced there is of course some possibility that a plaintiff may prevail on the merits.  This would turn a substantive

---

[3] That paragraph in *Elgin* makes clear that each of the sentences cited by the majority at Majority Op. 33 are examples of cases with "threshold questions," not additional pathways to preclusion. *See Elgin*, 132 S. Ct. at 2140 ("But petitioners overlook the many threshold questions that may accompany a constitutional claim and to which the MSPB can apply its expertise.  Of particular relevance here, preliminary questions unique to the employment context may obviate the need to address the constitutional challenge. *For example*, . . . *In addition*, . . . . *Or*, an employee's appeal may involve other statutory or constitutional claims that the MSPB routinely considers, in addition to a constitutional challenge to a federal statute." (emphases added)).  The Supreme Court has elsewhere defined a "threshold question" as one "that must be resolved . . . .before proceeding to the merits [of another claim]." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88–89 (1998).

factor into a purely procedural—and binary—one, which is inconsistent with the description of the factor in *Thunder Basin*, *Free Enterprise*, or *Elgin* itself.

In sum, to agree with the majority's interpretation of *Elgin*, one must conclude that the Supreme Court intended to eliminate any substantive analysis of the "wholly collateral" and the "outside the agency's expertise" factors in any case where an administrative proceeding is ongoing.[4] To the contrary, *Elgin* itself engages with the substance of the precluded claims in a way that the majority seems to believe is now unnecessary.

The majority's interpretation also serves to move the *Thunder Basin* factors away from their original function, which was to assist in a holistic analysis to determine whether it is "fairly discernible" from a "statutory scheme" that Congress "has allocated initial review to an administrative body." *Thunder Basin*, 510 U.S. at 207.

---

[4] In fact, in *Elgin*, only one of the plaintiffs had initiated administrative proceedings; the others had filed suit directly in the district court but *could have* initiated proceedings. *Elgin*, 132 S.Ct. at 2131. Consequently, the implication of the majority's reading of *Elgin* is likely to be even greater than this.

*Elgin* recognized this function: it engaged in an extensive analysis of the history and structure of the relevant statutes before turning to the *Thunder Basin* factors, which it referred to as "three additional factors in arguing that [the petitioners'] claims are not the type that Congress intended to be reviewed within the CSRA scheme."  132 S. Ct. at 2136.

I would apply the three *Thunder Basin* factors for divining legislative intent faithful to *Thunder Basin*, *Free Enterprise* and *Elgin*.

**III.    Application of the *Thunder Basin* Factors**

**A.    "Wholly Collateral to a Statute's Review Provisions"**

The Supreme Court in *Free Enterprise* concluded that the constitutional claim there was "wholly collateral" to any administrative proceedings that might be brought against the plaintiffs.  That challenge was essentially the same as the challenge here: that the appointment of the members of the PCAOB by the SEC violated the Appointments Clause of the Constitution.  It explained that the plaintiffs' "general challenge to the Board is

16

'collateral' to any Commission orders or rules from which review might be sought" because they "object to the Board's *existence*, not to any of its auditing standards." *Free Enterprise*, 561 U.S. at 490 (emphasis added). Here, as well, the appellants object to the very existence of SEC administrative proceedings conducted by ALJs who are, in their view, not appointed in accordance with the Appointments Clause.

The majority finds that this factor weighs against jurisdiction based only on its interpretation of *Elgin*, which I have addressed above. I would reject that interpretation. I see no difference between the Appointments Clause challenge in *Free Enterprise* and here; it is completely collateral to the work of the PCAOB as well as to the work of the SEC and its ALJs. I would find that this factor weighs strongly in favor of jurisdiction.

### B. "Outside the Agency's Expertise"

In *Free Enterprise*, the Supreme Court explained that the Appointments Clause claim relating to the appointment of the

PCAOB by the SEC was "outside the Commission's competence and expertise," requiring no understanding of a particular industry and no "technical considerations of agency policy." *Id*. at 491 (internal quotation marks and alterations omitted). The same conclusion applies to the Appointments Clause issue here. Like the determination of the appointment authority for the PCAOB members in *Free Enterprise*, the SEC has no particular expertise in determining whether the system of appointing its Administrative Law Judges comports with the Appointments Clause of the Constitution.

The majority agrees as far as *Free Enterprise* goes, concluding only that this *Thunder Basin* factor has been changed by *Elgin*. For the reasons discussed above, I disagree. I see no difference in the application of this factor here to the SEC and its application to the SEC in *Free Enterprise*. I would find that this factor also weighs strongly in favor of jurisdiction.

### C.     "Meaningful Judicial Review"

The "meaningful judicial review" factor presents the only significant difference between the present case and *Free Enterprise*. I agree with the majority that this factor tends to weigh in favor of preclusion because a subsequent appeal to this Court following a final Commission order is available.

Nonetheless, I do not believe that the difference between the available judicial review in *Free Enterprise* and in this case is so significant as to justify a different outcome, given the identical application of the other two factors, as well as a substantial question as to whether subsequent judicial review here would be "meaningful."

The majority is correct in noting that *Free Enterprise* differed from this case in that no reviewable administrative order was possible unless the plaintiff "manufactur[ed] a new, tangential dispute that *would* require a Commission order." Majority Op. at 17. And as the *Free Enterprise* Court noted, "[w]e normally do not

19

require plaintiffs to bet the farm by taking the violative action before testing the validity of [a] law." 561 U.S. at 490 (internal quotation marks and alterations omitted).

The *Free Enterprise* situation was not so different from the present one as to require a different outcome, however. Here, the administrative proceedings once concluded would have led to an order subject to judicial review—but only if the appellants had continued litigating before the SEC ALJ and lost on the merits.[5]

Forcing the appellants to await a final Commission order before they may assert their constitutional claim in a federal court means that by the time the day for judicial review comes, they will already have suffered the injury that they are attempting to prevent. The majority finds that the "litigant's financial and emotional costs

---

[5] Given that the vast majority of all SEC administrative proceedings end in settlements rather than in actual decisions, it might well be that choosing to litigate is, in fact, equivalent to "betting the farm." *See* Brian Mahoney, *SEC Could Bring More Insider Trading Cases In-House*, LAW360 (June 11, 2014), http://www.law360.com/articles/547183/sec-could-bring-more-insider-trading-cases-in-house (quoting Andrew Ceresney, the head of the SEC's Division of Enforcement, as explaining that the "vast majority of our cases settle," and stating, "I will tell you that there have been a number of cases in recent months where we have threatened administrative proceedings, it was something we told the other side we were going to do and they settled").

20

in litigating the initial proceeding are simply the price of participating in the American legal system," Majority Op. at 22, but the issue is less the costs and burden of litigation and more that the appellants are challenging the very existence of the ALJs as a part of the statutory scheme. The appellants seek to enjoin the SEC proceedings, but by the time that they access any judicial review, the proceedings will be complete, rendering the possibility of obtaining an injunction moot even if the final Commission order is vacated. In my view, this diminishes the weight of this factor, for while there may be review, it cannot be considered truly "meaningful" at that point.

The majority cites a number of decisions for the principle that "post-proceeding relief . . . suffices to vindicate the litigant's constitutional claim," Majority Op. at 21–22, but none involves an analysis of the "meaningful judicial review" prong of this test. *Germain v. Connecticut National Bank*, 930 F.2d 1038, 1040 (2d Cir.

1991) involved an interlocutory appeal of the denial of a jury trial demand in a bankruptcy proceeding and the application of the collateral order doctrine exception that an order be "effectively unreviewable on appeal." *D'Ippolito v. American Oil Co.*, 401 F.2d 764, 765 (2d Cir. 1968) addressed the question of whether an order by a district court transferring an antitrust action to another district was a "final judgment" under 28 U.S.C. § 1291. *In re al-Nashiri*, 791 F.3d 71, 79 (D.C. Cir. 2015), addressed the "irreparable injury" test meriting the grant of a writ of mandamus to stop a military commission trial. And *FTC v. Standard Oil Co. of California*, 449 U.S. 232, 244 (1980) concerned whether the issuance of a complaint by the Federal Trade Commission caused "irreparable injury" allowing for judicial review or whether final agency action was necessary.

When it comes to the "meaningful judicial review" factor, it is my view that we need look no further than *Free Enterprise* itself to understand that being forced to undergo an allegedly

22

unconstitutional proceeding may play into the analysis of whether judicial review is "meaningful." The Court in *Free Enterprise* identified a number of *possible* ways that the plaintiffs in that case could obtain review of their constitutional claims against the board (such as "select[ing] and challeng[ing] a Board rule at random" or "incur[ring] a sanction (such as a sizable fine) by ignoring Board requests for documents and testimony," 561 U.S. at 490); it simply decided that none of the options were reasonable to ask of the plaintiffs and therefore none provided "meaningful" judicial review. *Id*. at 490–91.

The Supreme Court in *Free Enterprise* also explained that the plaintiffs were "entitled to declaratory relief sufficient to ensure that the reporting requirements and auditing standards to which they are subject *will be enforced only by a constitutional agency accountable to the Executive*," and it allowed the plaintiffs to bring their claim at a time where no administrative proceedings had yet been formally brought

23

against them.  561 U.S. at 513 (emphasis added).  This suggests that the Supreme Court considers the very *process* of enforcement by an unconstitutional body to be an injury that can be relevant to the determination of whether post-proceeding review is "meaningful."

**IV.   Conclusion**

For all these reasons, I am unpersuaded that the "meaningful judicial review" prong has enough weight to overpower the other two factors and result in a finding of no jurisdiction.  The other two factors clearly mirror those in *Free Enterprise*, and the available review is not meaningful enough to set those two factors aside.  Thus, the Appointments Clause challenge here is not "of the type Congress intended to be reviewed within th[e] statutory structure."[6] *Thunder Basin*, 510 U.S. at 212.

---

[6] Since the purpose of the application of the *Free Enterprise* factors is to determine whether Congress intended to deprive district courts of subject-matter jurisdiction to hear pre-administrative-adjudication claims, it seems relevant that Congress continues to authorize the SEC to choose whether it will pursue violations before its ALJs in administrative proceedings or in the district court as civil actions.  To permit those subject to SEC enforcement actions to challenge administrative proceedings in the district courts on the basis of constitutional challenges that have nothing to do with the expertise of the SEC or with factual matters relevant to their own particular circumstances would seem consistent with that Congressional intent.

24

I would reverse the decision of the district court and remand for an adjudication of the merits of the Appointments Clause claim.